Camille DEJESUS, Individually and as Administratrix of the Estate of Alejandro DeJesus, Jr., Deceased, and the Estate of Felicia Lynne DeJesus, Deceased, et al.

v.

UNITED STATES OF AMERICA DEPARTMENT OF VETERANS AFFAIRS

v.

The Philadelphia Veterans Multi–Service & Education Center, Inc., d/b/a Landing Zone II Transitional Residence

v.

Landing Zone II Transitional Residence

No. CIV.A. 02–0253.

United States District Court, E.D. Pennsylvania.

July 26, 2005.

DIAMOND, District Judge.

On March 23, 1999, Alejandro DeJesus, Sr. shot and killed his children, Alejandro, Jr. and Felicia (ages eighteen and seven), and their friends, Michael and Aaron Faulk (ages sixteen and fourteen), and then committed suicide. The Veterans Administration Medical Center in Coatesville, Pennsylvania had been treating Mr. DeJesus since 1997 for severe mental problems—including Intermittent Explosive Disorder—drug addiction, and domestic abuse. The VA's medical records underscored that Mr. DeJesus was a severely disturbed, unstable individual who was likely to commit acts of domestic violence when frustrated or unemployed. Nonetheless, the day before the murders, the VA agreed to expel Mr. DeJesus from its transitional residence and fire him from his employment there because, for no rational reason, he had attacked another resident with a knife. Remarkably, the VA agreed to the expulsion even though DeJesus's Primary Therapist wanted him first to be evaluated by a Psychiatrist because she feared his expulsion might provoke him to an act of domestic violence.

In the instant case, the mothers of the murdered children have sued the VA, alleging that in light of Mr. DeJesus's severe mental illness and his violent, abusive history, the VA was grossly negligent in discharging Mr. DeJesus or in failing to treat, detain, or commit him after the knife fight.

Following a six day non-jury trial, I returned a verdict in favor of Plaintiffs. In accordance with Federal Rule of Civil Procedure 52, I now offer my supporting factual findings and legal conclusions.

## PROCEDURAL HISTORY

On January 16, 2002, Plaintiffs Camille DeJesus and Cheryl Faulk, acting on behalf of themselves and the estates of their deceased children, filed suit under the Federal Torts Claims Act against the VA. *See* 28 U.S.C. § 1346(b)(1). Their Complaint included the following causes of action:

Count I—the DeJesuses' claims for the VA's gross negligence in discharging or in failing to treat, detain, or commit Mr. DeJesus, and for failing to warn the DeJesuses that Mr. DeJesus was an imminent threat;

Count II—the Faulks' claims for the VA's gross negligence in discharging or in failing to treat, detain, or commit Mr. DeJesus, and for failing to warn the Faulks that Mr. DeJesus was an imminent threat;

Count III—a wrongful death claim on behalf of Alejandro DeJesus, Jr.;

Count IV—a wrongful death claim on behalf of Felicia Lynne DeJesus;

Count V—a wrongful death claim on behalf of Michael Brandon Faulk;

Count VI—a wrongful death claim on behalf of Aaron Ashanti Faulk;

Count VII—a survival claim on behalf of the estate of Alejandro DeJesus, Jr.;

Count VIII—a survival claim on behalf of estate of Felicia Lynne DeJesus;

Count IX—a survival claim on behalf of the estate of Michael Brandon Faulk;

Count X—a survival claim on behalf of the estate of Aaron Ashanti Faulk;

Count XI—Mrs. DeJesus's claim for negligent infliction of emotional distress; and

Count XII—Ms. Faulk's claim for negligent infliction of emotional distress.

As required by statute, their lawsuit would be heard by me sitting without a jury. *See* 28 U.S.C. §§ 1346(b)(1), 2402.

The VA filed a Third Party Complaint against Landing Zone II Transitional Residence. LZ–II elected to have this third-party action heard by a jury. Upon the agreement of the parties, the non-jury trial against the VA would proceed first on liability, and then, if necessary, on damages. If necessary, the jury trial on the third-party Complaint against LZ–II would then proceed.

At Summary Judgment, I dismissed the Faulk and DeJesus failure to warn claims in Counts I through X, and Ms. Faulk's claim for negligent infliction of emotional distress (Count XII).

I conclude that the VA was grossly negligent in agreeing to discharge or in failing to treat, detain, or commit Mr. DeJesus, and that it is liable to Mrs. DeJesus for negligent infliction of emotional distress.

### FINDINGS OF FACT

During their depositions, all the VA professionals who treated Mr. DeJesus admitted to facts that underscored the VA's appalling negligence in this matter. At trial, these same witnesses strove to undo, ignore, qualify, or evade their earlier testimony. In virtually all instances, I did not believe the witnesses' revised versions, and instead credited their deposition admissions. *See Davis v. United States Steel Supply,* Civ. No. 80–2571, 1981 WL 26711, **5–7, 1981 U.S.App. LEXIS 17407, at *20–*22 (3d Cir. Sep. 24, 1981) (allowing the crediting of deposition designations and documentary evidence over live testimony); *see also* FED. R. CIV. P. 52(a). My factual findings are based in no small part on these and other credibility determinations.

Perhaps the most striking deficiency in the VA's treatment of Mr. DeJesus was the failure of any VA professional to familiarize him or herself fully with the VA's own medical history of Mr. DeJesus. For instance, Mr. DeJesus's Primary Therapist did not know that a VA Psychologist had diagnosed Mr. DeJesus with Intermittent Explosive Disorder. A VA Psychiatrist confirmed this diagnosis, and prescribed a psychotropic drug to moderate Mr. DeJesus's explosive episodes. A second VA Psychiatrist who treated Mr. DeJesus for depression, however, did not know of the Intermittent Explosive Disorder diagnosis or the psychotropic medication. Mr. DeJesus's Treating Psychologist did not know that a VA Therapist had reported his concern at Mr. DeJesus's too-sanguine description of an earlier incident, when he shot and killed an individual. As a result of this universal ignorance of Mr. DeJesus's mental condition, no one at the VA knew just how disturbed and dangerous Mr. DeJesus was.

Significantly, trial evidence underscored that the critical decisions respecting Mr. DeJesus's expulsion from the LZ–II facility were made by the VA itself. Although LZ–II is a privately run transitional residence, the evidence showed quite clearly that it is a VA creation, receives its funding exclusively from the VA, operates exclusively on VA property, and exists solely to serve VA patients. No one at the VA ever informed LZ–II's staff of Mr. DeJesus's mental condition. On the contrary, Mr. DeJesus's primary VA Therapist had unintentionally misled LZ–II staff, informing them that he was suffering from no mental illness when exactly the opposite was true. The VA had structured LZ–II

so it would rely entirely upon the VA for all medical and psychological diagnoses and treatment. Accordingly, no one on LZ–II's staff had medical or psychological training. My view of the evidence—especially the testimony of the LZ–II witnesses—leads me to find that although LZ–II staff thought to expel Mr. DeJesus after the March 22nd knife incident, LZ–II looked to the VA to determine the advisability of such action. In these circumstances, the VA effectively made the decision to expel Mr. DeJesus, as well as the decision not to treat, detain, or commit him—decisions that had tragic consequences.

Finally, Plaintiffs presented the expert testimony of Dr. Robert Lloyd Goldstein. With a medical degree from the University of Chicago, a law degree from Columbia University, and a wealth of professional and academic experience, Dr. Goldstein is exceptionally well qualified to offer expert opinions respecting the evaluation, treatment, and detention of dangerous patients. Dr. Goldstein set out numerous instances in which the VA grossly breached the required standards of care respecting Mr. DeJesus. I found his testimony and report to be credible and compelling. The expert relied upon by the VA is an osteopath who is the Medical Director of a local Crisis Response Center. I found her testimony and report to be equivocal and far less persuasive. Yet, even the VA's expert agreed with a number of Dr. Goldstein's conclusions respecting the VA's mistakes.

## A. The Relationship Between Mr. And Mrs. DeJesus and Mr. DeJesus's Early History of Domestic Violence and Mental Illness

Camille and Alejandro DeJesus, Sr., were married in Brooklyn, New York in 1975 and had three children: Alejandro, Jr., Candida, and Felicia. (1.129–1.130). From the beginning of their marriage, Mr. DeJesus, a veteran of the United States Navy, used cocaine and heroin. (1.130–1.131, 1.134; Stipulated Facts ¶ 1). In 1986, after Mrs. DeJesus tried unsuccessfully to persuade Mr. DeJesus to stop using drugs, she left him and took her children with her to stay with relatives in upstate New York. (1.132). She told Mr. DeJesus that if he did not stop using drugs, he could not rejoin the family. (1.133). Mr. DeJesus gave up drugs and rejoined his family. (1.133).

In 1992, hoping for a new start, the entire family moved to Media, Pennsylvania. Unfortunately, Mr. DeJesus began to abuse his wife and children, striking them with his hands, brooms, or belts, leaving them with bruises, welts, and swelling. (1.137, 1.149; 1.185–1.187; 2.184–2.185). In January 1996, the abuse escalated when Mr. DeJesus choked Mrs. DeJesus and pushed her to the floor. (Stip. Facts, ¶ 2; 1.138–139). Mrs. DeJesus left her husband, and took her children to live with her brother and sister-in-law. (1.138–140).

In May 1996, Mrs. DeJesus moved out of her brother's home and rented an apartment in Media for herself and her two daughters. (1.141). There, the DeJesuses became close friends with their neighbors, the Faulks. (1.141). Alejandro, Jr. initially remained with Mr. DeJesus. (2.188). During the course of the next year, Mrs. DeJesus and her daughters saw Mr. DeJesus infrequently. (1.143).

Frustrated after the separation, Mr. DeJesus resumed his heroin use, and continued his violent behavior. (1.134–1.35). In April 1997, Mrs. DeJesus phoned the police after Mr. DeJesus struck her (1.143). In May 1997, Mr. DeJesus again went to his wife's apartment and attacked her. (1.144). Although Mr. DeJesus was carrying a knife and a gun (which he was licensed to carry), he never used the weapons. (1.145; Stip. Facts ¶ 5). When Alejandro Jr. sought to protect Mrs. De-

Jesus, Mr. DeJesus struck and pushed his son into a table and onto the floor. (1.144).

Mrs. DeJesus notified the police, who arrested Mr. DeJesus. (1.144, 1.145, 1.147; G–1; Stip. Facts ¶¶ 7, 8). Mrs. DeJesus also obtained a Protection from Abuse Order that prohibited Mr. DeJesus from coming near her apartment or Felicia's school. (1.147–1.148). While in custody, Mr. DeJesus tried to commit suicide. (P–50; 5.65).

The Protection Order notwithstanding, Mr. DeJesus again appeared at Mrs. DeJesus's apartment after he was released from custody. (1.149). She told him to leave and called the police. (1.149). Mrs. DeJesus and the children then ceased routine communications with Mr. DeJesus. (1.149.) Isolated from his family, Mr. DeJesus's mental condition and drug addiction worsened, and he became homeless, living in a shelter in Chester, Pennsylvania. (1.150).

## B. Mr. DeJesus Seeks Help From the Veterans Administration

Hoping to reconcile with his family, in September 1997 Mr. DeJesus entered the Veterans Administration Medical Center in Coatesville, Pennsylvania. (3.128; Stip. Facts ¶ 9). The VAMC is a specialty referral facility that treats veterans from Pennsylvania, Delaware, and New Jersey. (Stip.Fact.¶¶ 10, 11).

The VA initially assigned Mr. DeJesus to its Homeless Domiciliary Program, which provides homeless veterans with medical and psychiatric care, substance abuse treatment, vocational evaluation and conditioning, and job placement. (Stip. Fact.¶¶ 12, 13, 14). Since 1989, Stephen Chambers—a licensed psychologist with a doctorate in psychology—has headed the Domiciliary. (4.12; G49). The staff at the Domiciliary includes physicians, physician's assistants, registered nurses, psychologists, dieticians, social workers, physical therapists, vocational rehabilitation specialists, and addiction counselors. (*Id.*). The staff seeks to develop treatment plans that address each patient's problems. (Stip.Fact.¶ 15).

Mrs. DeJesus approved of her husband's decision to seek help, and remained willing to reconcile with him if his conduct improved. (1.151). She remained cautious, however, and did not visit Mr. DeJesus during his entire stay at the VAMC facilities. (1.151). Rather, she had periodic telephone conversations with her husband, who occasionally wrote to their daughter Candida. (1.190). The calls and the letters were affectionate, and included nothing threatening. (1.190–1.191).

## C. VA's Initial Diagnoses of Mr. DeJesus's Mental Condition

At the Domiciliary, Dr. Edward Moon, a licensed psychologist, was Mr. DeJesus's initial Treating Psychologist. (3.29–3.43). In 1999, Dr. Christopher Ray succeeded Dr. Moon as Treating Psychologist. (4.95–4.97). Dr. Moon diagnosed Mr. DeJesus with Intermittent Explosive Disorder, cocaine dependence and remission, and mood disorder. (P–2; 3.29–3.43). Dr. Moon based his diagnosis on the DSM–IV—the standard guide used to diagnose psychiatric disorders—which describes Intermittent Explosive Disorder as follows:

> The essential feature of Intermittent Explosive Disorder is the occurrence of discrete episodes of failure to resist aggressive impulses that result in serious assaultive acts or destruction of property. The degree of aggressiveness expressed during an episode is grossly out of proportion to any provocation or precipitating psychosocial stressor. A diagnosis of Intermittent Explosive Disorder is made only after other mental disorders that might account for episodes of aggressive behavior have been ruled out (e.g., Antisocial Personality Disorder, Borderline Personality Disorder, a Psy-

chotic Disorder, a Manic Episode, Conduct Disorder, or Attention Deficit/Hyperactivity Disorder). The aggressive episodes are not due to the direct physiological effects of a substance ... or a general medical condition.... The individual may describe the aggressive episodes as "spells" or "attacks" in which the explosive behavior is preceded by a sense of tension or arousal and is followed immediately by a sense of relief. Later the individual may feel upset, remorseful, regretful, or embarrassed about the aggressive behavior.

... Signs of generalized impulsivity or aggressiveness may be present between explosive episodes. Individuals with narcissistic, obsessive, paranoid, or schizoid traits may be especially prone to having explosive outbursts of anger when under stress. The disorder may result in job loss, school suspension, divorce, difficulties with interpersonal relationships, accidents ..., hospitalization ..., or incarcerations.

(P–13) (DSM–IV § 312–24). Although it is difficult to determine when Intermittent Explosive Disorder will manifest, it is usually in response to a specific "triggering" event. (1.16; P–13) (DSM–IV § 312–24). The afflicted individual may be calm between episodes, or may "exhibit some violence or impulsivity at a lower level," but when "triggered," he will undergo "outbursts" and periods of "extreme aggressiveness." (1.16).

In his discussions with Dr. Moon, Mr. DeJesus described his violent, abusive, relationship with his family. (3.30). Mr. DeJesus was tearful and emotional when he spoke about his family. (3.32–3.33). Dr. Moon identified Mr. DeJesus's aggression and abuse of his family as symptoms of Intermittent Explosive Disorder, and noted that stressful interactions with his family often "triggered" his rage. (P–2(b); 3.35–3.39). Dr. Moon also observed that and Mr. DeJesus "connected domestic violence with unemployment and frustration." (3.78). Dr. Moon further recognized that for persons with Intermittent Explosive Disorder, "the best predictor of future behavior is past behavior," because "there is a pattern" of repeated conduct. Accordingly, he cautioned that it was extremely important to monitor Mr. DeJesus's relations with his family. (3.35, 3.40–3.41).

Seeking a second opinion and a prescription for medication, Dr. Moon referred Mr. DeJesus to VA Psychiatrist Glasner, who confirmed that Mr. DeJesus had Intermittent Explosive Disorder, and prescribed 200 mg. of Tegretol, twice a day, to control his anger. (3.71; Stip. Facts ¶¶ 26, 27). Tegretol is an psychotropic, anti-convulsant medication commonly used as a mood stabilizer to control Intermittent Explosive Disorder. (Stip. Facts ¶ 28). Through the use of Tegretol and targeted therapy, Drs. Moon and Glasner hoped that Mr. DeJesus could learn to control his aggression and abusive, violent behavior. (3.35–3.40).

Mr. DeJesus told Dr. Moon that he had fleeting thoughts of suicide and homicide and had previously attempted suicide when he was arrested for attacking his wife. (3.32–3.33, 3.80–3.81). Concerned that Mr. DeJesus was depressed, Dr. Moon referred him to a second VA Psychiatrist, Dr. Tirso Vinueza. (3.68–3.71). Remarkably, Dr. Moon never told Dr. Vinueza that Mr. DeJesus was taking Tegretol to control his Intermittent Explosive Disorder, and Dr. Vinueza never reviewed Mr. DeJesus's treatment records or asked Dr. Moon, Dr. Glasner, or Mr. DeJesus himself if he was taking any medication. (G–7; 3.70–3.71). Thus, Dr. Vinueza concluded that Mr. DeJesus suffered from only "mild depression," which could be helped by psychotropic medication. (G–7). Dr. Vinueza did not realize, however, that Mr. DeJesus was already taking a psychotropic medication—Tegretol. (G–7). Because

neither Dr. Vinueza nor anyone else treating Mr. DeJesus had reviewed Mr. DeJesus's entire medical record, they did not properly diagnose or treat Mr. DeJesus's depression, nor did anyone at the VA know the full extent of Mr. DeJesus's mental illness. Thus, Mr. DeJesus never received competent and complete psychiatric and psychological treatment and therapy at the VA. (1.42–1.43, 1.44–1.45).

The VA also diagnosed Mr. DeJesus as a diabetic and prescribed daily does of insulin. (P–4(b)).

## D. The Failure of Mr. DeJesus's Primary Therapist to Learn of His Condition or Diagnoses

After these initial clinical and medical diagnoses, Mr. DeJesus was first referred to a social work intern, Vicky Lynn Zaszo, and then, to Denise Outzs–Cleveland, a health science specialist. (3.125; Dep. Des., p. 34). Ms. Outzs–Cleveland served as Mr. DeJesus's case manager and Primary Therapist, as well as a liaison between Mr. DeJesus and the rest of his treatment team. (3.107, 3.109). She provided Mr. DeJesus with individual and group counseling and substance abuse education, and headed his treatment team. (3.91–3.92, 3.107; Dep. Des. p. 34). Although Ms. Outzs–Cleveland has an RN degree, she does not have a license to practice as a nurse, which she has failed to obtain on two occasions. (Dep.Des. pp. 36, 67). Although the VA designated her as Mr. DeJesus's Primary Therapist, she does not have a license to practice as a Therapist because the VA does not require it. (Dep. Des. pp. 36, 37).

The VA has computerized each patient's entire clinical and medical history so that any member of the treatment staff can refer to all records when evaluating a patient. (Dep.Des. pp. 40–41). As Mr. DeJesus's Primary Therapist, it was Outzs–Cleveland's responsibility to review his medical records. (Dep.Des.45). Ms.

Outzs–Cleveland acknowledged that it was essential to know a patient's medications and diagnosis. (3.198). Although Ms. Outzs–Cleveland had ample opportunity to check Mr. DeJesus's computerized treatment records, she never did so. (3.198). Accordingly, she was ignorant of vital facts: that VA doctors had repeatedly diagnosed Mr. DeJesus with Intermittent Explosive Disorder, that Mr. DeJesus was taking Tegretol to control his aggression; that he was suffering from depression (which was going untreated); that problems with his family triggered his rage; that frustration and unemployment would likely trigger him to domestic violence; or that he had past ideations of homicide and suicide, and had once attempted suicide. (3.139–3.140, 3.198).

Ms. Outzs–Cleveland's failure to familiarize herself with Mr. DeJesus's medical records is all the more disquieting because she understood from her therapy sessions with him that he suffered from severe anger and anxiety problems, especially when he was separated from his family— as he was during his entire stay at the VA facilities. (3.136, 3.212). During those therapy sessions, Mr. DeJesus repeatedly told Ms. Outzs–Cleveland that he was distraught over his family problems, and was especially troubled because he could not see Felicia. (3.136, 3.212). Yet, like every other treating professional at the VA, Ms. Outzs–Cleveland inexplicably failed to review Mr. DeJesus's entire VA medical history.

## E. Mr. DeJesus's Prior Use of Deadly Force

During his stay at the VAMC, Mr. DeJesus displayed his violent inclinations. He told Ms. Outzs–Cleveland and VA Therapist Bruce Newell that he was a gun enthusiast and enjoyed target shooting. (4.77, 4.81; Stip. Facts ¶ 6). He also told Newell that he had once worked as a

security guard and had shot and killed another man. (4.73). Although Mr. Newell had treated many veterans who had killed others in combat, the casualness with which Mr. DeJesus described the shooting and "taking life" so shocked Newell that he immediately informed Domiciliary Chief Stephen Chambers—who told no one treating Mr. DeJesus of this information, and failed to record it in Mr. DeJesus's medical records. (4.76).

Additionally, sometime before March 22, 1999, Mr. DeJesus was involved in a violent interaction with his then roommate, William Melvin. (2.102–2.103). One morning, Mr. Melvin awoke to find Mr. DeJesus standing over him with a knife. (2.27). Although it is unclear whether Mr. Melvin mentioned this event to the LZ–II staff, he did inform his VA treatment group, although it is not clear when he did so. (2.42; 4.126–4.127). The Melvin incident showed that still Mr. DeJesus lacked the ability to control his aggression, and that the treatment he was receiving to control his Intermittent Explosive Disorder was not working.

### F. Mr. DeJesus's Transfer to LZ–II.

In February 1998, Mr. DeJesus was discharged from the Domiciliary facility, but was still eligible to stay at the VA's onsite facility, Landing Zone II TransitionalResidence. (G–9; 3.154–3.155; Stip. Facts ¶ 38). LZ–II is a privately run program exclusively for homeless veterans operated by the Philadelphia Veterans Multi–Service and Education Center, Inc. It is funded entirely by the VA, and situated on the Coatesville VAMC property. LZ–II provides housing for veterans for up to two years as they make the transition back into society. (Stip. Fact. ¶¶ 35, 42; 2.46). Marsha Fore is the Program Director for Homeless Veterans Services; Sandra Miller is responsible for LZ–II's day-to-day operations. (2.46, 2.101).

Pursuant to its grant under the VA Homeless Grant and Per Diem Program, LZ–II works in tandem with the VA to help veterans. (Stip. Facts ¶ 38). The VA is responsible for providing policing and safety services, as well as all mental health, psychiatric, and medical, and rehabilitative services for LZ–II's residents. (Stip.Fact.¶¶ 37, 38, 43). The VA Police also have full authority to make arrests at LZ–II and all VAMC property. (Stip. Facts ¶ 43). Accordingly, as of March 1999, LZ–II had no one on staff to provide psychological, medical, psychiatric, or counseling services. Rather, as the VA intended when it created LZ–II in 1996, LZ–II relied entirely on the VA to provide these services to its residents. Moreover, LZ–II had no access to the psychiatric and psychological records of its residents. (Stip. Facts ¶ 36; Stip. Fact ¶ 38; 3.205; P–8; Dep. Des. p. 52). Finally, as a creation of the VA, LZ–II would try to comply with any requests regarding the treatment or placement of its residents. (2.61–62, 2.67).

During a resident's stay at LZ–II, his VA Primary Therapist continues in that role. This system of continuing aftercare is necessary because veterans often relapse to past behavior. (3.82). In some instances, aftercare is needed for several years. (3.76). Thus, Ms. Outzs–Cleveland continued to treat Mr. DeJesus and to serve as his case manager and sole outpatient Therapist during his residence at LZ–II. (P–8; 2.103–2.104; 3.205 Dep. Des. p. 53).

Additionally, while residents are living at LZ–II, they are assigned to perform certain tasks for which they are paid. (2.102). Thus, a transferee to LZ–II is both a resident and an employee. (2.69). During his stay at LZ–II, Mr. DeJesus was employed as a cook in the LZ–II kitchen. (2.71).

Just before Mr. DeJesus moved to LZ–II, Ms. Outzs–Cleveland prepared his outgoing Clinical Referral Report, intended to inform LZ–II staff of Mr. DeJesus's condition, problems, and psychological state. (G–9; 3.153–3.155; Stip. Fact 31). Ms. Outzs–Cleveland prepared a Report that was grossly incorrect, incomplete, and outright misleading. She did not mention that Mr. DeJesus suffered from Intermittent Explosive Disorder or needed Tegretol to control his rage. (3.154.) Moreover, under "mental health diagnosis" she wrote "N/A"—meaning that the category was "not applicable"—because she erroneously believed that Mr. DeJesus did not have any mental health diagnoses. (Dep.Des. p. 48). Had she reviewed Mr. DeJesus's medical records before completing the Report, she would have known that in fact Mr. DeJesus had severe mental health problems. Thus, she unintentionally misled LZ–II staff, who believed that Mr. DeJesus was not suffering from mental illness. (Dep. Des. p. 49; 2.49).

With LZ–II's ignorance of Mr. DeJesus's disturbed state, it was not possible for LZ–II properly to evaluate Mr. DeJesus's behavior. For instance, in March 1998, Mr. DeJesus got into a heated argument with other LZ–II residents over a shared car ride. (1.120–1.103). Because the VA had misled LZ–II respecting Mr. DeJesus's mental condition, LZ–II staff had no way of knowing whether this was an isolated instance of anger, or part of a violent history, suggesting a deterioration in Mr. DeJesus's mental stability. (1.120–1.103).

### G. Mr. DeJesus's Further Deterioration

By late 1998, Mr. DeJesus's contact with his family had diminished significantly. (1.152). In November of that year, troubled and desperate to hold onto his family, Mr. DeJesus sought custody and visitation rights with respect to his daughter Felicia. (1.152–153). Later that month, the Delaware County Court held a custody hearing at which Mr. DeJesus submitted a letter from the VA, dated November 18, 1998.(P–8). Authored and signed by Ms. Outzs–Cleveland, the letter stated that Mr. DeJesus was sober and had learned to manage his anger, and that he was exceptional at interacting with others. (P–8, 1.155). This evaluation was incomplete and incorrect, as Ms. Outzs–Cleveland would have known had she consulted Mr. DeJesus's medical records. (P–8).

Moreover, like her Clinical Referral Report, Ms. Outzs–Cleveland's letter was misleading. Relying upon the letter, Mrs. DeJesus concluded that Mr. DeJesus had improved as a result of his stay at the Domiciliary and LZ–II. (1.155–156). She then agreed that Mr. DeJesus could have supervised visits with Felicia if he was first evaluated by a counselor and submitted his treatment records to a referee. (1.156–157). Mrs. DeJesus also decided that the time had come to end her marriage.

On February 1, 1999, Mrs. DeJesus filed for divorce. (Stip. Facts ¶¶ 57–58). Mr. DeJesus received the divorce papers on February 4, 1999.(P–6). Distraught and frustrated, he immediately called Ms. Outzs–Cleveland. Although Mr. DeJesus said that his call to Ms. Outzs–Cleveland had been a mistake—that he had intended to call his wife—it was clear that Mr. DeJesus was turning to his Primary Therapist for help in a time of disturbance. (1.21–1.23; Dep. Des. pp. 55, 59). Mr. DeJesus told Ms. Outzs–Cleveland that his wife had served him with divorce papers, and that he was terrified at the prospect of his family's imminent dissolution. (Dep. Des. pp. 55, 59).

It was apparent that Mr. DeJesus's condition had worsened. (1.22–1.23). Ms. Outzs–Cleveland was concerned about Mr. DeJesus's confusion and anger. (P–6).

She believed that he was psychologically unstable, and because she could not calm him down, she wanted to see Mr. DeJesus to conduct additional therapy "ASAP"—as soon as possible. (Dep. Des. p. 55; 3.167, 3.214). Nonetheless, neither Ms. Outzs–Cleveland nor anyone else at the VA made any effort to see him and had no contact with him between the February 4, 1999 telephone call and the March 22, 1999 knife incident. (Dep. Des. pp. 55–56; 3.165, 3.217). More disturbingly, Ms. Outzs–Cleveland told no one the VA or LZ–II of her concern about Mr. DeJesus's mental instability. (3.194). Additionally, although she was extremely concerned about Mr. DeJesus's reactions to the divorce, she never checked his medical records or asked others if there was some explanation for his condition. (3.194). Had she checked the records, she would have realized that Dr. Moon had determined that Mr. DeJesus's family problems would likely "trigger" his Intermittent Explosive Disorder.

Sometime in mid-March, Mr. DeJesus called his wife, again asking to see Felicia and discuss the divorce. Mrs. DeJesus did not want to talk to him, and said that he could not see Felicia unless he complied with the court ordered conditions. She also told him not to come to her apartment. (1.160–161). Distraught over these events, and facing the failure to attain his long-standing goal of reuniting with his family, Mr. DeJesus's mental condition worsened. (Dep.Des. pp. 51–52). Already distraught, on March 20, 1999, Mr. DeJesus bought a gun. (G–22).

### H. The Knife Incident

Mr. DeJesus's Intermittent Explosive Disorder, the triggering events in his life, and the VA's incompetence converged on March 22, 1999. Early that morning, Mr. DeJesus was involved in a violent altercation with another LZ–II resident, Bill Queen. (1.25–1.26; P–22). The two were cleaning the kitchen when Mr. DeJesus became violently angry at Mr. Queen for failing to remove a bucket of water. (P–22). Mr. DeJesus brandished a knife, and threatened Mr. Queen's life with it. (2.106; P–22). Another resident, Joe Lanzara, intervened and forced Mr. DeJesus to put down the knife—something Mr. DeJesus did with great reluctance. (2.113; P–22, P–23).

When Ms. Miller and Ms. Fore arrived around 7:00 a.m., they learned of the altercation. To determine what occurred, they immediately separated Mr. DeJesus and Mr. Queen—who were both angry—and interviewed them and the other witnesses to the incident. (2.55–2.56). They then asked Mr. DeJesus to leave the residence while they investigated further. (2.55–2.57). The staff noted that Mr. DeJesus was still very upset when he left LZ–II at 9:00 a.m., ostensibly to go to the library. Once he left, the staff lost track of him until the afternoon. (Ct–2).

### I. The VA Insists on Mr. DeJesus's Immediate Discharge from LZ–II

Since the VA created LZ–II's in June 1997, the DeJesus–Queen altercation was the only instance in which one resident threatened another resident with a weapon. (2.76). Thus, neither Ms. Fore nor Ms. Miller knew how to respond to what they deemed a major incident. (2.59, 2.76–2.76; P–23). They recognized that the altercation was out of character for Mr. DeJesus, and turned to the VA for help. (2.140, 2.52–2.53; P–17). They first asked Domiciliary Chief Chambers what they should do. (2.57; 2.107). They also made phone calls to Bruce Newell—Mr. Queen's Primary Therapist—and Ms. Outzs–Cleveland—Mr. DeJesus's Primary Therapist—pleading for their immediate and urgent assistance. (2.57, 2.108, 4.131–132).

From their testimony, it was apparent that LZ–II staff were prepared to do everything that they could to accommodate the entity that created and funded LZ–II, that provided LZ–II with residents, and on whose property LZ–II existed: the VA. Had the VA treatment professionals indicated that LZ–II should not expel Mr. DeJesus, LZ–II would not have done so. Thus, the VA effectively made the decision to expel Mr. DeJesus. (2.61–2.62, 2.86–2.87).

All the VA professionals involved in evaluating the knife incident came to the same conclusion: by threatening another resident with a knife, Mr. DeJesus had demonstrated that he was too dangerous to continue to reside in LZ–II, and so should be expelled. (2.113–2.114; 3.170 4.134; 4.81–4.82). Apparently it did not occur to any of them that Mr. DeJesus would be at least as dangerous (and certainly more so) once he was expelled and thus rendered homeless and unemployed. (5.22).

Dr. Chambers was the only VA staff member to respond immediately to LZ–II's call for help. (2.107). (2.113–2.114; 3.170; 4.81–4.82). At approximately 9:00 a.m., Dr. Chambers arrived at LZ–II and told Ms. Fore and Ms. Miller that Mr. DeJesus's conduct was dangerous, and that LZ–II had to discharge him for the safety of "the house, as a whole, rather than individuals." (2.78, 2.107, 2.108). Although Dr. Chambers had some previous contact with Mr. DeJesus and had found him to be "a model resident," he now concluded that Mr. DeJesus was a "different" person. (4.133). Despite this significant change, Dr. Chambers never saw or spoke to Mr. DeJesus. (4.132). It is disturbing that Dr. Chambers did not meet with Mr. DeJesus, given that he knew that Mr. DeJesus was "terrified" of leaving the VA. (4.132, 4.143; P–99). It is even more disturbing that Dr. Chambers would make such a decision without first reviewing Mr. DeJesus's medical history. (4.143). An immediate expulsion meant that Mr. DeJesus would leave LZ–II without a psychiatric consultation, a room check, or any medical professional first determining if Mr. DeJesus was taking his Tegretol and insulin. (2.108; 4.134; 4.144).

The other VA staff consulted by LZ–II followed Dr. Chambers's lead and told LZ–II to expel Mr. DeJesus. Around noon—and after Dr. Chambers left—Bruce Newell (Mr. Queen's Primary Therapist) arrived at LZ–II. Mr. Newell had received professional training in horticulture therapy and divinity. (4.51). Like Dr. Chambers, without speaking to Mr. DeJesus or his Doctors, and without reviewing Mr. DeJesus's medical records, Mr. Newell decided that LZ–II should expel Mr. DeJesus. (4.81). Yet, Mr. DeJesus's act troubled Mr. Newell not just because it was extremely violent, but also because (as described above) Mr. Newell knew that Mr. DeJesus was a gun enthusiast, and that Mr. DeJesus had callously described to Mr. Newell how he had once killed another man. (4.58, 4.73, 4.77, 4.81; Stip. Facts ¶ 6). Mr. Newell's concern notwithstanding, he decided that Mr. DeJesus should be expelled immediately to protect the safety of LZ–II's other residents and staff. (4.58, 4.77, 4.81).

Sometime around 1:00 p.m., Ms. Outzs–Cleveland made her way to LZ–II, and attended a meeting with Mr. Newell, Ms. Fore, and Ms. Miller. (2.58, 2.109). After speaking with Mr. DeJesus, she told Mr. Newell that in her opinion Mr. DeJesus needed inpatient treatment and an immediate or "STAT" psychiatric consultation; she wanted Mr. DeJesus taken for the consultation "right then and there." (4.83–4.87). She was "terrified" that once Mr. DeJesus was expelled, he would "want to harm others, particularly his estranged

wife." (2.226; 3.40; Dep. Des. 42, 65). She was also troubled because Mr. DeJesus did not appreciate the seriousness of brandishing a knife at Mr. Queen. (3.128; Dep. Dep p. 57).

Despite her grave concern respecting Mr. DeJesus's mental stability, Ms. Outzs–Cleveland—like everyone else from the VA—did not consult Mr. DeJesus's medical records. After the knife incident, had she—or anyone else involved in the decision to discharge Mr. DeJesus—done so, she would have known that the mood stabilization medication Mr. DeJesus was taking was not controlling his Intermittent Explosive Disorder, and that this disorder, combined with his still untreated depression, terror of being expelled from LZ–II, great frustration at his impending divorce, and related problems would almost certainly provoke him to act of great violence. (1.46). Had Dr. Chambers, Ms. Outzs–Cleveland, or Mr. Newell referred to the records, they would have realized that they were discharging a loudly ticking time bomb that, inevitably, would harm his family or himself. (1.46; 3.226).

### J. LZ–II Agrees with the VA and Expels Mr. DeJesus

With the VA's insistence on Mr. DeJesus's expulsion, and relying on Ms. Outzs–Cleveland's misleading Clinical Referral Report, Ms. Fore and Ms. Miller reluctantly agreed to Mr. DeJesus's immediate expulsion. (2.59). LZ–II staff recognized that it was unusual to expel a patient. (2.86–2.87). Had the VA told LZ–II not to discharge Mr. DeJesus because they had concerns about his mental stability, LZ–II would have agreed to let him remain. (2.61–2.62).

Significantly, before expelling Mr. DeJesus, no one sought to determine if he had any money in his resident savings account. (4.32; P–18). In fact, Mr. DeJesus had no savings. (4.32). In addition, once expelled, Mr. DeJesus automatically lost his job in LZ–II's kitchen. (4.32–4.33). Thus, Mr. DeJesus's expulsion from LZ–II necessarily meant he would be homeless. (4.32–4.33). Had any treatment professionals checked the medical records, they would have learned that Dr. Moon had determined that homelessness was likely to provoke Mr. DeJesus to commit acts of domestic violence. (3.78, 3.139–3.140, 3.198).

After meeting with Newell, Fore, and Miller, Ms. Outzs–Cleveland again spoke to Mr. DeJesus, who said that he intended to walk to Maine or New Hampshire, and that he was giving away many of his possessions. (3.180–3.181; 4.37, 4.139; Dep. Des. p. 61). These remarks suggested to Ms. Outzs–Cleveland that Mr. DeJesus might be having suicidal thoughts. Twice she offered to escort Mr. DeJesus to a VA Psychiatrist for evaluation. (3.172–3.173). He refused. (3.172–3.173). Looking for some direction, she first called Dr. Chambers to ask him how she could get an outpatient to be seen by a Psychiatrist. (3.177). Dr. Chambers told her she could offer to escort him to a Psychiatrist—something she had already done. (3.177).

Ms. Outzs–Cleveland then called Dr. Ray, her immediate supervisor and Mr. DeJesus's Treating Psychologist, to see if he knew of any other way to have Mr. DeJesus evaluated by a Psychiatrist before he left LZ–II. (3.178). During the conversation Dr. Ray was some 100 feet from LZ–II, attending a meeting with his treatment team. Ms. Outzs–Cleveland overheard the discussion among the team members indicating that they were confused over the applicable procedures, ultimately concluding that "we don't get involved with [outpatients]." (3.179; 4.42–4.43; Dep. Des. p. 60). Dr. Ray ultimately provided the same advice as Dr. Chambers: offer to escort Mr. DeJesus to a Psychiatrist. (3.179).

During her conversations with Dr. Chambers and Dr. Ray, Ms. Outzs–Cleveland never told either of them that she was "terrified" if Mr. DeJesus were expelled from LZ–II, he might harm his wife. (3.181). She did not tell them that her concern was so great that she wanted him evaluated "STAT," "right then and there." (3.181; 4.135–4.139; Dep. Des. P. 62). Nor did Ms. Outzs–Cleveland tell either the basis of her concerns: Mr. DeJesus's history of domestic violence; his involvement in custody and divorce proceedings; his frustration with the court system's slow handling of these proceedings; that he was giving away his possessions; that he said he was going to walk to Maine or New Hampshire. (3.181; 4.135–4.139; Dep. Des. p. 62).

At trial, both Dr. Ray and Dr. Chambers stated that additional information may have changed their decision respecting Mr. DeJesus's expulsion. (4.139). Yet, even though Dr. Ray was Mr. DeJesus's Treating Psychologist, he did not the 100 feet to LZ–II, where Mr. DeJesus—his patient— was being questioned. Dr. Ray explained that even though he was Mr. DeJesus's Treating Psychologist, he had never actually met his patient, and therefore "thought that it wouldn't be quite appropriate [to examine Mr. DeJesus] because [he] had never met him." (4.97–4.98). Dr. Ray also did not want to leave a scheduled staff meeting, although he knew that this was not an acceptable reason to fail to answer a call for assistance. (3.85).

Neither Dr. Chambers nor Dr. Ray was familiar with the involuntary commitment procedures under Section 302 of Pennsylvania's Mental Health Procedures Act, or any other procedures by which the VA or LZ–II could obtain a psychiatric consultation for an outpatient. (4.101–102). Dr. Chambers and Dr. Ray were also unsure as to what behavior constituted an emergency, an immediate threat, or an overt act—any of which would justify an involuntary commitment under Pennsylvania law. In light their ignorance respecting Section 302 procedures, they preferred to employ the VA's internal Psychiatric Emergency Assistance Team ("PEAT") or Code Green procedures. (4.107).

Under a PEAT or Code Green procedure—which the VA or LZ–II staffs may call from anywhere on the VAMC grounds—armed officers and psychiatric and medical personnel are called to respond to psychiatric emergencies, and provide the troubled person with emergency consultations and treatment. (4.100–4.107; Stip. Fact ¶ 87). Uniformed and armed VA Police are always available and have the authority to arrest both psychiatric and "traditional" offenders. (Stip. Fact ¶ 88).

Significantly, it was apparent from their trial testimony that Dr. Ray and Dr. Chambers did not fully understand when they could call a "Code Green" and involuntarily detain a patient. (4.103–4.107). Rather, all the VA treating professionals shared the tragically mistaken understanding that unless a patient was raving or manifestly irrational, they had no legal authority to detain him and have him evaluated. (Dep. Des. p. 59; 3.85; 3.117, 3.179; 3.221; 4.42–4.43; 4.97, 4.103–4.107). Remarkably, it never occurred to the Doctors that they could simply call the police to arrest Mr. DeJesus for attacking Mr. Queen with a knife. (4.107). Ultimately, the Doctors' ignorance of proper procedures, combined with Ms. Outzs–Cleveland's failure to communicate her grave concerns to the Doctors, ensured that no one could offer proper or effective advice to Ms. Outzs–Cleveland.

Finally, because the VA had misled LZ–II respecting Mr. DeJesus's disturbed state, LZ–II staff did not take measures that might have revealed Mr. DeJesus's

emotional instability and dangerousness. For instance, LZ–II had the authority to search every resident's room at any time. (2.63–2.64, 2.66, 2.67). Had LZ–II searched Mr. DeJesus's room, it would have discovered that upon being told of his expulsion, Mr. DeJesus shredded his clothing, thus evincing great emotional instability and upset. (2.63–2.64, 2.66, 2.67; 4.144). Even more important, a search of Mr. DeJesus's room on March 22nd would have revealed that he had purchased a gun on March 20th. (G–22). Because the VA had misled LZ–II into accepting that knife incident was an isolated act of violence—and not compelling evidence of Mr. DeJesus's mental deterioration—LZ–II did not conduct the search. (2.67).

## K. The DeJesus Family's Understanding of Mr. DeJesus's Condition

The VA never shared with Mrs. DeJesus any of its diagnoses respecting Mr. DeJesus's violent, disturbed nature, or the VA's concerns respecting the likelihood that Mr. DeJesus would commit an act of domestic violence. (3.198). On the contrary, the only communication concerning Mr. DeJesus's condition that Mrs. DeJesus received from the VA was Ms. Outzs–Cleveland's November 18, 1998 letter to the Delaware County Court, stating incorrectly that Mr. DeJesus had learned to manage his anger. (P–8).

Although Mrs. DeJesus and her children well understood that Mr. DeJesus could be physically abusive, they never thought he would seriously harm them. (2.10). Mrs. DeJesus and her children were very close to her brother Al Viti—then employed as a United States Marshal—and Lynn Viti—then employed a United States Treasury Agent. Pursuant to their official duties, the Vitis carried firearms at all times. (1.138–1.140). The Vitis lived nearby and saw Mrs. DeJesus and her children constantly. (1.38–1.40). Indeed, the Vitis had dinner at Mrs. DeJesus's home on the night of March 23, 1999. (1.169). They were aware that Mr. DeJesus had visited Mrs. DeJesus on the evening of March 22nd. (1.170–1.171). They did not remain at the DeJesus home on March 23rd because they did not believe that Mr. DeJesus would seriously harm his family. (2.10). If Mrs. DeJesus had such a fear, she would have asked the Vitis to help protect her and her children. (1.67–1.68). The Vitis were quite prepared to offer such protection. (2.12). Mrs. DeJesus never asked for their help because neither she nor the Vitis believed that Mr. DeJesus would seriously harm his family. (2.12).

## L. Mr. DeJesus's Explosive Reaction to the VA's Actions

At the time of his expulsion, Mr. DeJesus told Ms. Miller that he knew that he had broken rules, and expressed embarrassment, remorse, and regret. (2.138). According to the DSM–IV, such apologetic behavior after an outburst is a customary symptom of Intermittent Explosive Disorder. (P–13).

After learning of his expulsion, Mr. DeJesus gave away several of his most cherished possessions. (2.66). He packed some of his clothes and the gun he just purchased in a bag and shredded his remaining clothes. (2.66). He also stated that he was going to walk to Maine or New Hampshire. (2.66).

Mr. DeJesus then immediately went to Mrs. DeJesus's home. When he arrived, Mrs. DeJesus would speak to him only through the door. Mr. DeJesus told her that he would agree to the divorce, and that he had left LZ–II to go live with his brother in New York. He asked Mrs. DeJesus to give him his brother's phone number and some money. (1.162–163). Mrs. DeJesus gave him the phone number, but refused to give him money. (1.165–166). During the conversation, Mr. DeJesus was calm and did not do or say anything that

was hostile or threatening. Following their conversation, Mrs. DeJesus told Mr. DeJesus that he had to leave, and that if he did not, she was going to call the police because she did not want him lingering outside her home. (1.166). Mr. DeJesus was reluctant to leave, and Mrs. DeJesus called the police. (1.166). Mr. DeJesus left before they arrived. (1.166).

When the police arrived, Mrs. DeJesus told them about the expired Protection Order and reiterated that she did not want Mr. DeJesus loitering outside her home. She also told the police that her son was going to be home alone the next day, and that she was concerned that if her husband visited, the two would get into a fight. (1.167–168).

The next evening—March 23rd—Mrs. DeJesus, her children, Aaron and Michael Faulk, and the Vitis had dinner together in Mrs. DeJesus's apartment. (1.169). After dinner, Al and Lynn Viti left. (1.169). A short time later, the police came to Mrs. DeJesus's door and told her that they had found Mr. DeJesus's bag with his insulin, needles, and clothes at a nearby train stop. (1.70). Mrs. DeJesus told them that she had not heard from him that day, and that he had told her that he was going to his brother's home. (1.170). Mrs. DeJesus then spoke with Lynn Viti on the telephone and told her that the police had found Mr. DeJesus's bag. Because she saw no need for protection, she did not ask Mrs. Viti to come over, nor did she ask if she could go to the Vitis' home. (1.171).

Shortly after the police left, Mr. DeJesus entered the apartment through the kitchen door. (1.171). Carrying a gun, he ran past Mrs. DeJesus and immediately shot and killed Michael Faulk. (1.171–172). Mrs. DeJesus ran from the apartment to get help. She went to her neighbor's abutting apartment which was few feet away. (1.172). As she ran from her apartment, she heard additional gunshots and knew that Mr. DeJesus was shooting her children. (1.173, 1.218; P–50 at p. 81). Mrs. DeJesus entered the abutting apartment and told her neighbor "that the kids were shot, [and that she] needed the cops." (1.173). Her neighbor immediately called the police. (1.173).

As Mrs. DeJesus ran for help, Mr. DeJesus shot and killed his children and the Faulk children. (1.174). He then turned the gun on himself and committed suicide. (1.174). When the police arrived, Mrs. DeJesus tried to enter her apartment, but the police pulled her away and would not tell her if the children were alive. (1.174). Mrs. Faulk walked down the stairs from her apartment after Mrs. DeJesus called to tell her that "Michael had been shot." (3.7). Both Mrs. DeJesus and Ms. Faulk waited together, and soon learned that Mr. DeJesus had killed their children and then committed suicide. (1.174).

The next day, upon hearing of a murder-suicide in Media, and even before learning who was involved, the VA and LZ–II staffs immediately feared that Mr. DeJesus may have committed the crimes. (P–38(7)). Only then did they consult—for the first time—Mr. DeJesus's psychological and medical treatment records. (P–38 (7)).

At trial, Mrs. DeJesus described in detail how she heard her husband shoot and kill her children. (1.170–1.174). The grief and horror she has suffered were painfully obvious. Hearing the murder of her children has caused Mrs. DeJesus to suffer stress, anxiety, depression, and post-traumatic stress disorder. (P–88; P–89).

## M. Mr. DeJesus's Condition at the Time of His Expulsion from LZ–II

On March 22, 1999, Alejandro DeJesus, Sr. was severely depressed and suffering from Intermittent Explosive Disorder. (P–92; 122–1.23, 1.25–1.26 1.34, 1.46–1.47). The combination of the divorce and custody proceedings had caused his condition to

deteriorate so that he was not capable of controlling his violent urges, as he demonstrated when he attacked Mr. Queen. (1.25–1.26, 1.46). His expulsion from LZ–II caused a further deterioration of his profoundly disturbed emotional state, making him far more likely to commit a violent act. (P–92; 1.25–1.26; 1.120–1.103). The VA's own medical records, combined with Mr. DeJesus's behavior as known by the VA on March 22nd, clearly showed that it Mr. DeJesus's expulsion would very likely cause him to commit a violent act against his family, himself, or both. (P–2; P–6; P–8; P–22; P–99; G–7; G–9; Dep. Des. pp. 48, 55–56, 59, 61, 62; Stip. Fact ¶ 8; Stip. Facts ¶ 31; 2.226, 2.102–2.103, 2.42, 2.49; 3.29–3.43, 3.139–3.140, 3.68–3.71, 3.78, 3.80–3.81, 3.128, 3.136, 3.153–3.155, 3.167, 3.172–3.173, 3.180–3.181, 3.198, 3.212–3.214, 3.226; 4.32–4.33,4.37, 4.58, 4.73, 4.76, 4.77, 4.81, 4.83–4.87, 4.132–4.139, 4.139, 4.144).

This is not a case where the VA failed properly to diagnose its patient. Collectively, the VA knew exactly how disturbed and violent Mr. DeJesus was. Had anyone treating Mr. DeJesus reviewed his records, or had the treating professionals discussed among themselves their treatment of Mr. DeJesus, the March 23, 1999 killings would not have occurred.

Based on my review of all the evidence, I find that at the time of his expulsion, the VA should have known—based on its own records and its own observations of Mr. DeJesus—that Mr. DeJesus was a seriously mentally disturbed person who presented an imminent, clear, and present danger to himself and others. A competent and complete psychiatric evaluation before Mr. DeJesus actually left the VAMC grounds would have confirmed this. (1.39, 1.46–1.47). Accordingly, had the VA compelled Mr. DeJesus's psychiatric examination, he would have been committed. (1.46–1.47).

### N. The VA's Failure to Understand Mr. DeJesus's Condition

It is shocking just how much information was not shared by Mr. DeJesus's Therapists and Doctors, and how extensive their failure to examine or investigate Mr. DeJesus's clinical and medical history was. Among these failures were: (1) Dr. Moon's failure to inform Dr. Vinueza that Mr. DeJesus was taking Tegretol to control his Intermittent Explosive Disorder; (2) Dr. Vinueza's failure to review Mr. DeJesus's treatment records or to ask Dr. Moon, Dr. Glasner, or even Mr. DeJesus whether Mr. DeJesus was on any psychotropic medication before evaluating him for depression; (3) Ms. Outzs–Cleveland's failure to review Mr. DeJesus's entire clinical and medical histories while she served as Mr. DeJesus's Primary Therapist; (4) Ms. Outzs–Cleveland's failure to consult with Mr. DeJesus's Doctors or to review his medical records before representing to the Delaware County Court that Mr. DeJesus had learned to manage his anger and was exceptional at interacting with others; (5) Ms. Outzs–Cleveland's failure to review Mr. DeJesus's medical records before preparing his Clinical Referral Report, which she sent to LZ–II; (6) the failure of Dr. Chambers to record or inform anyone of Mr. Newell's concern respecting Mr. DeJesus's casual description of the killing he committed when he was a security guard; (7) Ms. Outzs–Cleveland's preparation of a tragically incorrect and misleading Clinical Referral Report on which LZ–II relied; (8) the failure of Drs. Moon and Ray—Mr. DeJesus's Treating Psychologists—to review his medical history at any time; (9) Ms. Outzs–Cleveland's failure after her February 4, 1999 discussion with Mr. DeJesus to determine if he was receiving treatment to address the emotional instability his divorce was causing; (10) Ms. Outzs–Cleveland's failure to inform the VA or LZ–II staffs that she was worried about

Mr. DeJesus's condition and reaction to the pending divorce and custody proceedings, and that she wanted to see him "ASAP" for a consultation; (11) Ms. Outzs–Cleveland's failure on March 22, 1999, to discuss with the VA and LZ–II staffs her concerns about Mr. DeJesus's mental state and potential for domestic violence; (12) the failures of Dr. Chambers, Dr. Ray, and Mr. Newell, to review Mr. DeJesus's records before deciding to expel him from LZ–II; and (13) the VA's failure to check Mr. DeJesus's bank account before expelling him from LZ–II. (1.40–1.45; 3.70–3.711; Stip. Facts ¶¶ 26, 27; G–7). Collectively these failures show a systemwide breakdown in communication and demonstrate that no one at the VA understood just how dangerous and disturbed Mr. DeJesus was.

## CONCLUSIONS OF LAW

### A. The VA's Multiple Breaches of the Standard of Care

■ The VAMC had an obligation to care for its patient, Alejandro, DeJesus, Sr., in a competent manner, consistent with medically accepted standards of care. *See Graham v. Barolat*, No. 03–2029, 2004 WL 2668579, **2–3, 2004 U.S. Dist. LEXIS 23567, at *5–*6 (E.D.Pa. Nov. 17, 2004) (*citing Welsh v. Bulger*, 548 Pa. 504, 698 A.2d 581, 585 (1997)).

### Failure to Treat and Communicate Information

■ The VAMC's multiple, egregious errors represented major breakdowns in communication and reporting and a systemwide failure of the VA treating professionals to know what their colleagues were doing or reporting. (1.42–1.47). As I have found, no one at the VA knew Mr. DeJesus's full medical and psychological condition. (1.47). This constituted a gross deviation from the required standard of care in treating a patient. (1.38–1.45, 1.47).

### The Decision to Discharge Mr. DeJesus

■ As I have found, on March 22, 1999, Mr. DeJesus was distressed and irrational, displaying poor control of his violent urges by brandishing a knife in his place of employment. (1.34). His Primary Therapist was "terrified" that Mr. DeJesus expulsion would trigger an act of domestic violence. (Dep.Des. p. 64). Further, Mr. DeJesus made comments that his Primary Therapist believed were potentially suicidal. (1.34). Rather than expel Mr. DeJesus, under the required standards of care, the VA should have initiated a therapeutic intervention, starting with a psychiatric evaluation, and then taken whatever other therapeutic measures were necessary. (1.34). If the VA determined that he was too dangerous to be treated while still a resident at LZ–II, then the VA should have taken steps to have Mr. DeJesus committed. (1.34–1.35).

Had the VA professionals shared their information, performed their duties competently, and read Mr. DeJesus's treatment file, it would have been manifest that once discharged, Mr. DeJesus presented a clear and present danger to himself and his family. (1.34–1.35). In expelling Mr. DeJesus in these circumstances, the VA grossly breached the required standard of care. (1.34).

### Failure to Commit or Detain Mr. DeJesus

■ Once the VA decided to expel Mr. DeJesus, it again breached the required standard of care by failing to detain or commit him. (1.34–1.35). First, the VA could have called for involuntary commitment under Pennsylvania law. *See* Mental Health Procedures Act, 50 Pa. Stat. Ann. § 7114. Given Mr. DeJesus's irrational and dangerous behavior on March 22, 1999, the VA should have compelled Mr. DeJesus to submit to a a psychiatric evaluation. (1.37). Under Pennsylvania law,

such an evaluation can be compelled if a person is seriously mentally disabled, presenting a clear and present danger to himself or others based on an overt act. (1.38). *See* Mental Health Procedures Act, 50 Pa. Stat. Ann. §§ 7114, 7301; *see also Bodor v. Horsham Clinic,* No. 94–7210, 1995 WL 424906, *1, 1995 U.S. Dist. LEXIS 10006, at *4 (E.D.Pa. July 17, 1995) ("[W]henever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness . . . he poses a clear and present danger of harm to others or to himself."). Here, such compulsion was proper because: (1) Mr. DeJesus suffered from a mental illness, Intermittent Explosive Disorder; (2) Mr. DeJesus had committed the overt act threatening Mr. Queen with a knife; (3) Mr. DeJesus's Primary Therapist was terrified that Mr. DeJesus would commit an act of violence against his family, as he had in the past; (4) Mr. DeJesus's medical records underscored that he was disturbed and dangerous; and (5) as I have found, the facts the VA knew or should have known made manifest that Mr. DeJesus was an imminent, clear, and present danger to himself, his family, and others. (1.39). Had the VA treatment professionals known the law and their patent's condition, they could have compelled an evaluation and committed Mr. DeJesus under Section 302.

Second, the VA could have used its own PEAT or Code Green procedures to evaluate and detain Mr. DeJesus. (4.100;1.38). Under the PEAT or Code Green procedures, a team of armed officers and psychiatric and medical personnel can be called to respond to psychiatric emergencies anywhere on the VAMC property if "there is a likelihood of some imminent dangerous behavior taking place or about to take place." (4.100). Persons may be committed and detained if they "present[ ]

a clear and present danger to themselves or others." (G–37). Here, the VA could have compelled Mr. DeJesus's evaluation on the same grounds that would have justified compulsion under § 302. In addition, the VA could have compelled his evaluation simply because he had brandished a knife and threatened Mr. Queen. The VA staff's failure to recognize this simple fact as basis for detaining Mr. DeJesus and compelling him to see a psychiatrist is as inexplicable as it is inexcusable. It is remarkable that neither Dr. Chambers or Dr. Ray explained this to Ms. Outzs–Cleveland when she was asking for a basis to detain Mr. DeJesus. That failure is explained by Dr. Chambers's and Dr. Ray's ignorance of the VA's own detention and evaluation procedures. (3.177; 4.101–4.102). It is also remarkable that Ms Outzs–Cleveland, the Primary Therapist, did not know these procedures. (1.38). Had the VA known and followed its own procedures on March 22, 1999, Mr. DeJesus would have been detained. (1.47).

Third, had the VA professionals performed competently, they would have conducted a suicide or psychiatric assessment so that they could commit Mr. DeJesus. Once again. I have found that Mr. DeJesus was an imminent, clear, and present danger to himself or others, and so presented a "psychiatric emergency," justifying his commitment. The VA's expert, Dr. Brooke Ziteck, pointed to several factors that to "varying degrees . . . may constitute a psychiatric emergency." (5.47–5.50). These factors included: (1) evidence of poor "coping strategies"; (2) change in family status, e.g. getting divorced; (3) change in a "support group"; (4) a move; (5) job loss; and (6) changes at work or treatment group. (5.47–5.50). Here, Mr. DeJesus demonstrated all these factors: (1) for no rational reason, Mr. DeJesus had threatened Mr. Queen with a knife; (2) Mrs. DeJesus had filed for divorce; (3)

once discharged, Mr. DeJesus would lose his friends and "support group" at LZ–II; (4) he was leaving LZ–II; (5) he was losing his job at LZ–II; and so (6) would have no work. (5.47–5.50). Additionally, Mr. DeJesus had past ideations of suicide and had once actually tried to kill himself. (5.45–5.51). Had the VA competently performed its duties, it would have recognized that Mr. DeJesus was possibly suicidal and having an imminent psychiatric emergency. (1.47). Accordingly, under its own procedures, the VA could have detained or committed Mr. DeJesus as a threat to himself or others. (G–37).

Fourth, the VA could have detained Mr. DeJesus by simply calling the police to arrest him for attacking Mr. Queen with a knife. *See Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir.1997) (an attack gives rise to probable cause to arrest). It is extraordinary that this possibility never occurred to any of the VA professionals.

The VA's failure to appreciate any of the these four possible avenues to detain or commit Mr. DeJesus constituted gross breaches of the required standards of care. (1.38).

### B. Gross Negligence

To recover for the VA's decision to discharge Mr. DeJesus or for its failure to detain or involuntarily commit him before he was discharged, Plaintiffs must establish that the VA was grossly negligent in its decisions regarding Mr. DeJesus. *See* Mental Health Procedures Act, 50 Pa. Stat. Ann. § 7114; *see also Bloom v. DuBois Regional Medical Ctr.*, 409 Pa.Super. 83, 597 A.2d 671, 677 n. 6, 679 (1991); *Doby v. Decrescenzo*, Civ. No. 94–3991, 1996 WL 510095, **22–23, 1996 U.S. Dist. LEXIS 13175, *70–*71 (E.D.Pa.1996). *See generally* 28 U.S.C. § 1346(b)(1).

■ Under Pennsylvania law, gross negligence is "a form of negligence where the facts support substantially more than

ordinary carelessness, inadvertence, laxity, or indifference. The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care." *Bloom*, 597 A.2d at 679; *see also Albright v. Abington Memorial Hospital*, 548 Pa. 268, 696 A.2d 1159 (1997); *Doby*, 1996 WL 510095, **22–23, 1996 U.S. Dist. LEXIS 13175 at *70–*71. In determining whether a treatment facility has committed an act of gross negligence, an important factor is whether the patient under its supervision showed a tendency to be violent or dangerous to himself or others. *See Albright*, 696 A.2d at 1166. Pennsylvania law clearly provides that if a treatment facility commits gross negligence in its decision to discharge or not to evaluate, treat, or commit a patient, then the facility is liable for any harm it substantially caused to any foreseeable victims. *See* 50 P.S. § 7114(a); *see also Sherk v. County of Dauphin*, 531 Pa. 515, 614 A.2d 226, 232 (1992); *see also Goryeb v. Commonwealth, Dep't of Public Welfare*, 525 Pa. 70, 78, 575 A.2d 545 (Pa. 1990).

Here, the VA grossly breached the required standard of care by: (1) failing to treat Mr. DeJesus properly and communicate information; (2) discharging Mr. DeJesus without first evaluating him; and (3) failing to detain or commit Mr. DeJesus. These failures and breaches went substantially beyond ordinary laxity or indifference. Rather, they were flagrant, and grossly deviated from the ordinary standard of care. *See Bloom*, 597 A.2d at 679; *see also Albright v. Abington Memorial Hospital*, 548 Pa. 268, 696 A.2d 1159 (1997).

■ The VA's tragic decision to expel Mr. DeJesus "[w]ithout a doubt ...[took] someone who [was] already in crisis and ...compound[ed] that crisis many fold because ... now that [the VA was] throwing him out of the sanctuary where he [had]

been for over a year." (1.140). Thus, the VAMC's multiple breaches and its insistence that Mr. DeJesus be discharged without an evaluation, detainment, or involuntary commitment substantially caused the death of Alejandro DeJesus, Jr., Felicia DeJesus, Mark Faulk, and Aaron Faulk. *See Sherk v. County of Dauphin*, 531 Pa. 515, 614 A.2d 226, 232 (1992) (causation established when hospital "prematurely" discharged mental patient who shot another some six weeks after discharge); *see also Goryeb v. Commonwealth, Dep't of Public Welfare*, 525 Pa. 70, 78, 575 A.2d 545 (Pa.1990) (causation established when hospital improperly discharged a mutual patient who shot three people a week after his discharge); *Ford v. Jeffries*, 474 Pa. 588, 379 A.2d 111, 115 (1977).

Had the VA competently performed its duties to review and share information and to understand the law, it would have discovered that Mr. DeJesus: (1) was a severely troubled individual with Intermittent Explosive Disorder, who needed psychotropic medication (Tegretol) to control even his day-to-day aggression; (2) had a history of domestic violence, which he connected to homelessness and frustration; (3) was losing his family—the most important thing in his life; (4) had recently purchased a gun; (5) had experience using guns; (6) was showing clear signs of "regression" and suicidal ideation; (7) had tried to kill himself once before; and (8) presented a plain threat that he would violently harm his family or himself. (Dep.Des. p. 64). Given Dr. Moon's observation that past behavior is that the best predictor of violence committed by patients with Intermittent Explosive Disorder, the VA should have realized that by discharging Mr. DeJesus, it was "triggering" his rage disorder, and that he would again attack his family or himself. The VA's decision to expel Mr. DeJesus from LZ–II "triggered" this episode of Mr. De-

Jesus's rage disorder, and therefore directly and substantially caused the children's murders. *See Sherk*, 614 A.2d at 232.

It apparent from reviewing Mr. DeJesus's treatment records and history (something no one at the VA ever did) that once the VA expelled him, Mrs. DeJesus and anyone in her home were in foreseeable danger. This is exactly what Ms. Outzs–Cleveland foresaw on March 22, 1999, and what the VA staff feared on March 24th— before actually learning that Mr. DeJesus had committed the murders. (3.40; Dep. Des. p. 65; P–38(7)). *See Sherk v. County of Dauphin*, 531 Pa. 515, 614 A.2d 226 (1992); *see also Goryeb v. Commonwealth Department of Public Welfare*, 525 Pa. 70, 575 A.2d 545 (1990); *Ford v. Jeffries*, 474 Pa. 588, 379 A.2d 111 (1977).

The VA argues that Mrs. DeJesus's own actions—not locking the door and not leaving her apartment altogether—were superseding causes, relieving them of liability. *See Vattimo v. Lower Bucks Hospital, Inc.*, 502 Pa. 241, 465 A.2d 1231, 1237 n. 4 (1983). A third-party's actions do not constitute a superseding cause, however, unless "the actor at the time of [her] negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime." *See Ford*, 379 A.2d at 115; *see also M.B. v. Women's Christian Alliance*, Civ. No. 00–5223, 2003 WL 21384836, **4–5, 2003 U.S. Dist. LEXIS 10105, *16–*17 (E.D.Pa. June 16, 2003). As I have found, before the shooting, Mrs. DeJesus did not realize, nor should she have reasonably realized, that Mr. DeJesus was capable of homicidal acts against her or her children. In fact, relying on Ms. Outzs–Cleveland's November 18, 1998 letter to the Delaware County Court, Mrs. DeJesus believed that her husband was

less likely to abuse her and her family. Nothing Mrs. DeJesus did was a substantial factor in bringing about the deaths of the four children. *See Ford v. Jeffries,* 474 Pa. 588, 379 A.2d 111 (1977).

Accordingly, I conclude that the VA was grossly negligent in discharging Mr. DeJesus and in not evaluating, detaining, or committing Mr. DeJesus, and that each of these acts of gross negligence substantially caused the deaths of Alejandro DeJesus, Jr., Felicia DeJesus, Michael Faulk, and Aaron Faulk. *See Bloom,* 597 A.2d at 677 n. 6, 679.

### C. Negligent Infliction of Emotional Distress

█ To recover for negligent infliction of emotional distress, a third-party bystander must demonstrate that she: (1) was located near the scene of the accident; (2) suffered "a direct emotional impact ... from the sensory and contemporaneous observance of the accident, *as contrasted with learning of the accident from others after its occurrence* "; and (3) was closely related to the injured party. *See Edmonson v. Bug Stop, Inc.,* Civ. No. 00–2379, 2001 WL 1160761, **1–2, 2001 U.S. Dist. LEXIS 15865, at * 3–*4 (E.D.Pa.2001) (emphasis added), *citing Love v. Cramer,* 414 Pa.Super. 231, 606 A.2d 1175 (1992); *see also Sinn v. Burd,* 486 Pa. 146, 404 A.2d 672 (1979); *Krysmalski v. Tarasovich,* 424 Pa.Super. 121, 622 A.2d 298 (1993).

█ Mrs. DeJesus has made out these elements. She was either in her apartment or fleeing to the apartment a few feet away when she saw her husband shoot Michael Faulk and heard her husband shoot her children and Aaron Faulk. (1.170–1.174). Thus, she was "near" the "accident." Her children—Alejandro, Jr. and Felicia—were obviously "closely related" to her. Hearing her husband shoot her children and Aaron Faulk has caused

her to suffer stress, anxiety, depression, and post-traumatic stress disorder. (P–88; P–89). Under Pennsylvania law, these conditions constitute the requisite physical manifestations of "direct emotional impact." *See Edmonson,* 2001 WL 1160761, *2, 2001 U.S. Dist. LEXIS 15865, at *6 (anxiety, depression;, and post-traumatic stress disorder constitute physical manifestations). Finally, under Pennsylvania law,

> aural perception (hearing the impact) when considered together with prior and subsequent visual observance ...may produce a full, direct, and immediate awareness of the nature and import of the negligent conduct which may foreseeable result in emotional injury.

*Neff v. Lasso,* 382 Pa.Super. 487, 555 A.2d 1304, 1313–14 (1989). Mrs. DeJesus saw her husband shoot Michael Faulk and heard her husband shoot her children. Under Pennsylvania law, she has proven the "sensory and contemporaneous observance" element of negligent infliction of emotional distress.

In these circumstances, Mrs. DeJesus has made out that the VA, in discharging Mr. DeJesus or in failing to treat, detain, or commit him, committed gross negligence, and that this gross negligence substantially caused her to suffer profound emotional distress. *See Sinn v. Burd,* 486 Pa. 146, 404 A.2d 672 (1979); *see also Krysmalski v. Tarasovich,* 424 Pa.Super. 121, 622 A.2d 298 (1993).