696 A.2d 1159

**John W. ALBRIGHT, as executor of the Estate of Elizabeth Jean Albright and individually in his own right, Appellant,**

**v.**

**ABINGTON MEMORIAL HOSPITAL and Montgomery County Emergency Services, Appellees.**

Supreme Court of Pennsylvania.

Argued Oct. 17, 1996.

Decided June 17, 1997.

270

Mark R.Semisch, Willow Grove, for John W. Albright.

Donald F. Ladd and Kevin J. Maginnis, Philadelphia, for Abington Mem. Hospital.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## *OPINION*

CAPPY, Justice.

This appeal raises two issues. First, whether a trial judge can enter summary judgment in favor of a mental health facility covered under the Mental Health Procedures Act (the Act)[1] where an allegation of gross negligence has been offered? Second, assuming an affirmative answer to the first issue, whether in this case gross negligence has been demonstrated by the pleadings, reports, depositions, and records so as to preclude the entry of summary judgment on behalf of Appellee Abington Memorial Hospital (Appellee or the Hospital) and against Appellant John W. Albright (Appellant or Mr. Albright)? As a collateral matter, we must address the *res nova* issue for this court of what constitutes "gross negligence" for purposes of the Act. For the reasons which follow, we affirm the trial court's granting of summary judgment in favor of the Hospital.

In order to properly address the issues raised in this case, a detailed review of its facts and procedural history is necessary. In April, 1987, Elizabeth Jean Albright was involuntarily committed to Eugenia Hospital, and was subsequently discharged into an outpatient program after improvement of her condition. Again in August, 1988, Mrs. Albright was involuntarily committed to Thomas Jefferson Hospital. However, on September 6, 1988, it was determined that Mrs. Albright did not meet the standards for an involuntary commitment.

Shortly thereafter, Mrs. Albright was involuntarily committed to the Montgomery County Emergency Services (MCES) from September 12, 1988 through September 28, 1988 after

1. 50 P.S. § 7101, et seq.

showing psychotic symptoms, which included threats against and physical attacks upon her husband. After being treated with appropriate medication and therapy, Mrs. Albright's condition improved so that a regime of 90 days of involuntary outpatient care at the Hospital was ordered by the Montgomery County Court of Common Pleas. The court's order indicated that a failure to comply with the order would result in a return to inpatient status. The 90–day period began on September 28, and was to have elapsed on December 27, 1988. Mrs. Albright was evaluated by Dr. George Buck, the Hospital's psychiatrist on September 30, 1988. She was diagnosed as having a bipolar disorder, i.e., a manic depressive disorder.

The arrangements for the outpatient treatment included therapy sessions once a month for three months. While Mrs. Albright refused to sign the consent to treatment, she did attend the first therapy session with her husband on October 13, 1988 and the second session on November 3, 1988. At both of these sessions, Dr. Buck re-evaluated Mrs. Albright. During these sessions Mrs. Albright indicated that she was not taking her medication, and that the medication was too expensive to take on a regular basis. Dr. Buck advised Mrs. Albright and her husband that she should take the medication as directed. Dr. Buck also suggested that Mrs. Albright see Audrey Moody, a social worker and clergywoman, in hope that Ms. Moody would provide supportive therapy and an insight as to the need for medication and compliance with the medical program.

Mrs. Albright failed to attend her third appointment scheduled for December 8, 1988 with Ms. Moody. Evidently, neither Dr. Buck, Mr. Albright, MCES nor the Hospital's case management office were informed that Mrs. Albright had missed her December 8 session.

On December 10, 1988, when the family visited Mrs. Albright's father, a renowned physician, her condition began to deteriorate. Mrs. Albright's father observed to Mr. Albright that Mrs. Albright was overly active and becoming manic. As the Christmas holiday approached, Mrs. Albright's condition continued in decline.

Although the dates are somewhat unclear, it appears that on December 21, 1988, the 84th day of the 90–day outpatient treatment program, Mr. Albright called the Hospital and informed Ms. Moody that Mrs. Albright was not taking her medication and was losing touch with reality. He was told that someone would return his call. Early the next morning, Mr. Albright called MCES, after failing to reach anyone at the Hospital. The person to whom he spoke promised to investigate. Mr. Albright testified that later that day, the Hospital's doctor with whom Mrs. Albright had the appointment on December 8th called and stated that because Mrs. Albright had missed her appointment, there was nothing that the Hospital could do. The doctor did advise that he call MCES. However, in Mr. Albright's follow-up telephone conversation with MCES, MCES explained that the Hospital would have to handle the problem. At that point, the individual that Mr. Albright spoke with originally at MCES called back and stated that the Hospital's case management unit would handle the situation and that Mr. Albright was to contact Mr. Joseph Windish of the Hospital's case management office.

In a subsequent telephone conversation with Mr. Windish, Mr. Albright explained that Mrs. Albright was having a breakdown, was becoming manic, and was in need of medical help. However, Mr. Windish informed Mr. Albright that as the 90–day treatment period was almost at end, it would be highly irregular to have a patient committed that late in the treatment plan. Upon Mr. Windish's request, Mr. Albright described Mrs. Albright's behavior. He stated that his wife had let the dinner burn in the oven so that smoke was coming out of the oven when he arrived home from work. He explained that Mrs. Albright had been walking at night and was chain smoking. Finally, he described cigarette burns in six-month-old furniture, but was not sure when the burns were made.

Mr. Windish's notes indicate that he explained to Mr. Albright that as there were only four days left in Mrs. Albright's treatment period, that this was not enough time to attempt a

§ 306 transfer,[2] and suggested that Mr. Albright attempt an involuntary commitment under § 302.[3] Mr. Albright responded that he had filed numerous § 302 petitions in the past but that his wife was still not getting the help that she needed. The conversation ended with Mr. Windish informing Mr. Albright that he would discuss the situation with his supervisor, Mr. Scott McCalla.

Mr. Albright called the Hospital later that day and again spoke with Mr. Windish. By that time Mr. Windish had spoken with his supervisor who indicated that nothing could be done as there was no time for a § 306 transfer and that the case was probably not strong enough to qualify for a § 302 commitment. Mr. Windish stated that he would call Mrs. Albright and schedule an appointment with her for December 28, the earliest available date. He also indicated that he would attempt to determine whether anyone had followed up on Mrs. Albright's missed appointment.

After speaking with Ms. Moody, who agreed to meet with Mrs. Albright on December 28, Mr. Windish telephoned Mrs. Albright to reschedule. However, Mrs. Albright became verbally aggressive, indicated that she wanted to focus on Christmas with her family and that she was through with appointments. Mrs. Albright did tell Mr. Windish to call back after Christmas and that she might reschedule at that time.

Upon his arrival that evening, Mr. Albright asked his wife if anyone had called from the Hospital, to which Mrs. Albright replied, "I told them I would meet them at the ocean." After an uneventful evening during which Mrs. Albright may have spoken with her father, Mrs. Albright's father called Mr. Albright at approximately 10:00 p.m. and told him to get his wife into a hospital. When the Albright's son returned home at approximately 10:30 p.m., he engaged in an argument with

2. § 306 of the Act relates to the transfer of persons in involuntary treatment to a facility imposing lesser or greater restraint on the patient. 50 P.S. § 7306. This section requires a hearing before a judge or a mental health review officer if the transfer constitutes a greater restraint upon a person's liberty.

3. § 302 of the Act refers to an involuntary emergency examination and treatment authorized by a physician. 50 P.S. § 7302.

his mother. Thereafter, Mr. Albright and his son retired upstairs for the evening leaving Mrs. Albright downstairs in the den where she slept.

In the morning hours of December 23, 1988, a fire erupted in the Albright home which took Mrs. Albright's life. The fire was determined to have originated in the den. While the cause of the fire was never established with certainty, it was determined to have most probably been caused by careless smoking.

Mr. Albright thereafter brought the present wrongful death and survival action against, *inter alia,* the Hospital.[4] The Hospital raised the affirmative defense of qualified immunity found in § 7114(a) of the Act in its answer and new matter. Pursuant to the qualified immunity provision of the Act, the Hospital is immune from civil and criminal liability for certain decisions that it makes unless it committed willful misconduct or gross negligence.

On October 11, 1994, the Hospital filed a motion for summary judgment. Following oral argument, the trial court granted the Hospital's motion on February 8, 1995. The trial court found that as a matter of law, the Hospital's conduct did not rise to the level of gross negligence. On November 22, 1995, a unanimous panel of the Superior Court affirmed, finding that based upon Appellant's deposition testimony as supplemented by Hospital medical records and notes of treating staff, Appellant failed to set forth a *prima facie* case of gross negligence.[5] Moreover, the Superior Court determined

4. An action was also filed against MCES. However, MCES's motion for summary judgment was granted by the trial court, and Appellant's appeal of that determination was withdrawn.

5. The Superior Court, in affirming the trial court's determination, characterized the situation as one where the moving party was relying in whole or in part upon oral deposition testimony. Therefore, the Superior Court employed the three step analysis set forth in *Dudley v. USX Corp.,* 414 Pa.Super. 160, 606 A.2d 916 (1992), *alloc. denied,* 532 Pa. 663, 616 A.2d 985 (1992) used to evaluate a motion for summary judgment in such situations. The first step of the analysis is to determine whether the plaintiff offered facts sufficient to establish a *prima facie* case. The second step is to determine whether there is any discrepancy as to any facts material to the case. Finally, a determina-

that the trial court did not err in taking the issue of the Hospital's negligence from the jury or in finding that no reasonable jury could have found that the Hospital acted in a grossly negligent manner.

With respect to the first issue on appeal, Appellant raises two subarguments. Appellant initially argues that, because both the Act and case law fail to provide a clear definition of what constitutes the difference between ordinary negligence and gross negligence, resolution of whether the Hospital's conduct constituted gross negligence should have been left for the jury; therefore, this is a question which is inappropriate for resolution by summary judgment. Appellant also argues that if he alleges gross negligence and can establish even ordinary negligence on the part of the Hospital, then it is for the jury to decide whether the Hospital's conduct constitutes gross negligence.

To resolve Appellant's first argument, we must interpret the Act's qualified immunity provision. This section of the Act provides certain individuals and entities with the protection of limited immunity from civil and criminal liability:

> In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be examined or treated under this act, or that a person be discharged, or placed under partial hospitalization, outpatient care or leave of absence, or that the restraint upon such person be otherwise reduced, or a county administrator or other authorized person who denies an application for voluntary treatment or for involuntary emergency examination and treatment, shall not be civilly or criminally liable for such decision or for any of its consequences.

50 P.S. § 7114(a).

Simply stated, Appellant must prove willful misconduct or gross negligence to throw off the blanket of limited immunity

___

tion is made as to whether in granting summary judgment, the trial court usurped the role of the jury by resolving any issues of material fact. In this case, the Superior Court found that Appellant failed the first step of the analysis in that he failed to establish a *prima facie* case.

which protects a mental health facility such as the Hospital. As Appellant does not assert willful misconduct on the part of the Hospital, our focus narrows to whether the Hospital's conduct rises to the level of gross negligence. Obviously, the meaning of this phrase is critical to the determination of the Hospital's immunity under the Act and the propriety of summary judgment in favor of the Hospital.

■ The Act itself does not provide a definition of the phrase "gross negligence." Moreover, this court has not had the opportunity to determine what constitutes gross negligence for purposes of the Act. Both the trial court and the Superior Court in the case *sub judice* relied upon the definition of gross negligence as stated by the Superior Court in *Bloom v. DuBois Regional Medical Center,* 409 Pa.Super. 83, 597 A.2d 671 (1991).

In *Bloom,* a husband and wife brought suit against the DuBois Regional Medical Center, the manager of the psychiatric unit, and a psychiatrist employed by the center for injuries sustained from an incident in which Mrs. Bloom, who was voluntarily admitted to the psychiatric unit of the center for inpatient treatment, was found after a failed suicide attempt. In reversing the granting of preliminary objections in favor of the psychiatrist, the Superior Court analyzed the limited immunity provision of the Act and in doing so, attempted to define the difference between ordinary negligence and gross negligence. After noting that the Act itself failed to provide a definition and determining that cases from this Commonwealth interpreting the Act failed to provide a workable definition to evaluate the complaint, the *Bloom* court turned to Keeton, *Prosser and Keeton on Torts,* Ch. 5, § 34 at pp. 210–11 (5th ed.1984) for an analysis of the common law. The court found that degrees of negligence have largely been rejected at common law as vague, impracticable, difficult, and confusing.

Finding Pennsylvania cases interpreting the phrase outside of the context of the Act to be of little value, but still being left with the legislation to be interpreted, the *Bloom* court arrived at a definition of gross negligence for purposes of the Act:

It appears that the legislature intended to require that liability be premised on facts indicating more egregiously deviant conduct than ordinary carelessness, inadvertence, laxity, or indifference. We hold that the legislature intended the term gross negligence to mean a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference. The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care.

*Bloom,* 409 Pa.Super. at 98–99, 597 A.2d at 679.

We believe that this definition is a clear, reasonable, and workable definition of gross negligence which is consistent with the purpose and intent of the Act. Therefore, Appellant's argument that the definition of gross negligence is unclear must fail.

Appellant's second argument regarding the first issue is that if *any* lesser degree of negligence can be shown by Appellant, then it is for the jury to decide the issue of whether the conduct of the Hospital rises to the level of *gross* negligence. Appellant quotes *Bloom* in support of his position. "[T]he determination of whether an act or failure to act constitutes negligence, of any degree, in view of all the evidence has always been particularly committed to determination by a jury. It is an issue that may be removed from consideration by a jury and decided as a matter of law only where the case is entirely free from doubt and there is no possibility that a reasonable jury could find negligence." *Bloom,* 409 Pa.Super. at 99, 597 A.2d at 679–80 (citations omitted). As the trial court found that the facts presented could amount to "ordinary negligence," Appellant asserts that pursuant to *Bloom,* the trial court erred in taking the issue of gross negligence from the jury.

■ While it is generally true that the issue of whether a given set of facts satisfies the definition of gross negligence is a question of fact to be determined by a jury, a court may take the issue from a jury, and decide the issue as a matter of law, if the conduct in question falls short of gross negligence, the

case is entirely free from doubt, and no reasonable jury could find gross negligence. *See, e.g., Willett v. Evergreen Homes, Inc., et. al.,* 407 Pa.Super. 141, 595 A.2d 164 (1991), *alloc. denied,* 529 Pa. 623, 600 A.2d 539 (1991) (summary judgment affirmed as to employees of facility pursuant to Mental Health and Retardation Act of 1966, 50 P.S. § 4603, which contains a limited immunity provision similar to that found in the Act at issue and which immunizes certain treatment decisions unless such decisions rise to the level of, *inter alia,* gross negligence); 57A Am.Jur.2d § 256. Appellant's reliance upon and interpretation of *Bloom* is in error. The *Bloom* court merely restated basic summary judgment law. Never did the *Bloom* court indicate that where, as here, a plaintiff asserts gross negligence but establishes only ordinary negligence, summary judgment would be precluded. A more logical and sound reading of the proposition set forth in *Bloom* is that the determination of whether an act or failure to act constitutes *gross* negligence is for a jury, but may be removed from consideration by a jury and decided as a matter of law only where the case is entirely free from doubt and there is no possibility that a reasonable jury could find *gross* negligence.

To require mental health employees and their employers to defend jury trials on the issue of gross negligence where the trial judge finds as a matter of law that, at best, only ordinary negligence has been established, would gut the limited immunity provision of the Act of any meaning and unfairly subject such employees and facilities to protracted and expensive litigation. Therefore, Appellant's arguments regarding the first issue on appeal must fail.

We now turn to Appellant's second issue on appeal. Appellant contends that he has presented by the pleadings, reports, depositions, and records sufficient evidence of gross negligence so as to preclude the entry of summary judgment in favor of the Hospital.

In reviewing a grant of summary judgment, an appellate court may disturb the order of the trial court only where there has been an error of law or a clear or manifest

abuse of discretion. *Shomo v. Scribe,* 546 Pa. 542, 546, 686 A.2d 1292, 1294 (1996); *Panichelli v. Liberty Mutual Insurance Group,* 543 Pa. 114, 116, 669 A.2d 930, 931 (1996). Nevertheless, the scope of review is plenary; the appellate court shall apply the same standard for summary judgment as the trial court. *Cooper v. Delaware Valley Medical Center,* 539 Pa. 620, 632, 654 A.2d 547, 553 (1995).

█ Granting of summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Pa.R.C.P. 1035(b).[6] The record is to be viewed in the light most favorable to the nonmoving party, and all doubts as to the presence of a genuine issue of material fact must be resolved against the moving party. *Pennsylvania State University v. County of Centre,* 532 Pa. 142, 144–45, 615 A.2d 303, 304 (1992).

Appellant argues that sufficient facts have been presented to show gross negligence on the part of the Hospital, and that therefore, the granting of summary judgment in favor of the Hospital was in error. Specifically, Appellant alleges that the Hospital failed to provide Mrs. Albright with proper treatment, ignored warnings of her deteriorating mental condition, and failed to have Mrs. Albright committed as an inpatient.

Appellant's primary contention is that the Hospital did nothing to follow-up on Mrs. Albright's failure to attend her December appointment. It is not disputed that Mrs. Albright's failure to attend her December appointment was not promptly addressed by the Hospital. Yet, when the missed appointment was brought to its attention, the Hospital's staff sought through various conversations with both Mr. Albright and Mrs. Albright to reschedule the appointment, and attempted to arrange such a meeting within a week. It must be

6. Pa.R.C.P. 1035 has been rescinded effective July 1, 1996 and new Rules of Civil Procedure 1035.1 through 1035.5 governing summary judgment replace former Rule 1035. However, these changes do not affect our standard of review in this matter.

noted that the Hospital was never informed in any of these conversations that Mrs. Albright was violent or dangerous to herself or others, which may have pointed to a different course of action.[7]

Appellant also argues that the Hospital ignored Mrs. Albright's deteriorating mental condition and failed to commit Mrs. Albright. Appellant submits that after being informed of Mrs. Albright's manic state, the Hospital did nothing. Appellant's expert opined that the Hospital could have made an *ex parte* telephone call to the "signing magistrate" seeking to commit Mrs. Albright for failing to comply with the outpatient order and that its failure to do so represents a gross deviation from the standards of case management.

■ To resolve this issue, we must focus upon what the Hospital was informed in the days prior to the fire which took Mrs. Albright's life. Specifically, the Hospital, in an attempt to evaluate the possibility of commitment, asked Mr. Albright about Mrs. Albright's condition. Mr. Albright informed the Hospital of the following. Mrs. Albright had not been taking her medication. She had missed her last appointment. She had a breakdown, was becoming manic, and was walking around at night. She had left a dinner burn in the oven. Finally, she was chain smoking and there were some cigarette burns on the couch, but it was not clear when the burns were made.

It is with this information that the Hospital determined what appropriate and possible courses of action would be for Mrs. Albright. The Hospital believed that by Thursday,

7. Additionally, Appellant contends that the Hospital did not provide an adequate, updated, and fully documented treatment plan as required by the Act, 50 P.S. § 7104, 7108, and therefore, because the Hospital violated the Act's provisions, it cannot avail itself of the Act's limited immunity provision. Appellant raised these same arguments and allegations in his Petition For Allowance of Appeal with respect to an issue on which we denied allocatur. Appellant cannot now argue an issue for which allocatur was not granted, nor attempt to inject such an issue into the issues which were granted. Moreover, there is no indication that these arguments were made before the trial court or the Superior Court. Finally, Appellant's bald allegations concerning the Hospital's treatment plan are without any meaningful support from the record.

December 22, the 85th day of the 90–day outpatient treatment period, there was insufficient time to attempt a § 306 commitment, which would involve committing Mrs. Albright as an involuntary inpatient. This type of commitment involves the transfer of a person subject to involuntary treatment to another facility. However, if such a transfer entailed a greater restraint upon a person's liberty, which would have been the case here in transferring Mrs. Albright to inpatient status, a court hearing and a finding of necessity was required. 50 P.S. § 7306(c). Again, the Hospital believed that timing was such that a § 306 petition could not have been decided prior to the expiration of Mrs. Albright's 90–day order.

Likewise, the Hospital believed a petition for an emergency § 302 commitment of Mrs. Albright was insupportable. A § 302 commitment would have required a finding that Mrs. Albright was severely mentally disabled and in need of immediate treatment. 50 P.S. § 7302. A person is severely mentally disabled when, as a result of mental illness, her capacity to exercise self-control, judgment and discretion in the conduct of her affairs and social relations or to care for her own personal needs is so lessened that she poses a clear and present danger of harm to others or herself. 50 P.S. § 7301(a). Thus, the Hospital determined that there was insufficient evidence to establish that Mrs. Albright was a clear and present danger to herself or others as of December 22. Nevertheless, the Hospital suggested that Mr. Albright attempt such a § 302 involuntary emergency examination. This suggestion was rejected by Mr. Albright.

Thus, far from ignoring Mrs. Albright, the Hospital solicited information concerning her condition and exercised its judgment as to what course of action was appropriate at that time. Based upon the information in the possession of the Hospital, which was devoid of any evidence that Mrs. Albright presented a clear and present danger to herself or others due to her mental condition or smoking habits, and in light of the applicable statutory requirements, the lower courts found that the conduct of, and the judgment exercised by the Hospital did not, as a matter of law, rise to the level of gross negligence.

With the above stated definition of gross negligence in mind, that is, that the Hospital's conduct had to be flagrant, grossly deviating from the ordinary standard of care, and after reviewing the record as we must in the light most favorable to Appellant, we believe that the lower courts did not commit an error of law or manifestly abuse their discretion in determining that no reasonable jury could have found that the Hospital acted in a grossly negligent manner.[8]

■ As the Superior Court below opined, at worst, the Hospital's staff exercised poor judgment. We cannot expect those covered by the Act to be soothsayers, and the limited immunity provision of the Act recognizes this understanding. The granting of summary judgment is particularly appropriate here in light of the intent of the Act to provide limited immunity from civil and criminal liability to mental health personnel and their employers in rendering treatment in this "unscientific and inexact field." *Farago v. Sacred Heart General Hospital,* 522 Pa. 410, 417, 562 A.2d 300, 304 (1989). The purpose of the Act's immunity provision is to insulate

8. Appellant also argues that *Willett v. Evergreen Homes, Inc., et al., supra,* is controlling. In *Willett,* a wrongful death and survival action was brought against a counseling center, two of the center's employees, and Evergreen Homes, a mental health facility after the drowning death of a mentally retarded patient in a bathtub at the facility. The Superior Court affirmed the granting of summary judgment on behalf of the counselling center and its employees pursuant to the limited immunity provision of the Mental Health and Retardation Act of 1966, finding that the conduct of those persons could not be characterized as grossly negligent. The Superior Court noted in *dicta* that the trial court had denied summary judgment in favor of Evergreen Homes, as the institution knew of the decedent's history of seizures, knew of the importance of monitoring decedent, and yet, left the decedent unattended in the bathtub.

First, the *Willett* court's analysis of Evergreen Homes' conduct is *dicta,* and, therefore, is non-precedential. Moreover, the circumstances in *Willett* are readily distinguishable from the case *sub judice.* The decedent in *Willett* was an inpatient under the direct and immediate care, supervision, and control of Evergreen Homes, here, Mrs. Albright was an outpatient living at home. Also, as the decedent in *Willett* had epilepsy, Evergreen Homes was aware of the immediate need to constantly monitor the decedent's bathing activities, where here, the Hospital had no information on which to believe that Mrs. Albright was a danger to herself or others. Far from being controlling, our review of *Willett* does not persuade us that the lower courts erred in this matter.

mental health employees and their employers from liability for the very determinations made by the Hospital here.

In summary, we find that the lower courts applied a clear and workable definition of gross negligence, which, for purposes of the Act, constitutes conduct substantially more than ordinary carelessness, inadvertence, laxity, or indifference; that is, behavior that is flagrant, grossly deviating from the ordinary standard of care. Moreover, we find that when presented with facts that do not meet the definition of gross negligence, as a matter of law, a court may withdraw the factual determination of gross negligence from the jury and decide the question as a matter of law. Finally, we hold that in the case *sub judice,* the lower courts did not commit an error of law or manifestly abuse their discretion in determining that based upon the pleadings, reports, depositions, and records, no genuine issue of material fact was presented as to the Hospital's conduct which could be found by a reasonable jury to rise to the level of gross negligence.

Therefore, as we perceive no error of law or manifest abuse of discretion in the lower courts' decisions, the Superior Court's order affirming entry of summary judgment in favor of the Hospital is affirmed.

ZAPPALA, J., concurs in the result.

NIGRO, J., files a dissenting opinion.

NIGRO, Justice, dissenting.

I disagree with the majority's determination that, as a matter of law, no reasonable jury could have found the Hospital acted in a grossly negligent manner. Because this case is not entirely free from doubt and should have been presented to the jury, I believe Appellant has presented sufficient facts to support a finding of gross negligence on the part of the Hospital. Accordingly, I dissent.

Summary judgment may be granted only in those cases where the right is clear and free from doubt. In a motion for summary judgment, the moving party has the burden of

proving the nonexistence of any genuine issue of material fact. Further, the record must be viewed in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Marks v. Tasman*, 527 Pa. 132, 134–135, 589 A.2d 205, 206 (1991) (citations omitted).

Instantly, the majority adopts the definition of grossly negligent as articulated in *Bloom v. DuBois Regional Medical Center*, 409 Pa.Super. 83, 597 A.2d 671 (1991) and finds the question of whether the Hospital acted in a grossly negligent manner was properly removed from the jury's consideration. In *Bloom*, the Superior Court defines gross negligence as conduct found to be flagrant, grossly deviating from the ordinary standard of care.[1] *Bloom* leaves open the controlling question of whether the judge or jury should make the determination as to what constitutes "flagrant." Here, the majority suggests the question was clearly for the judge as a matter of law. I disagree.

The *Bloom* court stated whether an act or failure to act constitutes negligence, of any degree, when viewing all the evidence is a determination for the jury and may be decided as a matter of law only when the case is entirely free from doubt, with no possibility that a reasonable jury could find negligence. *Bloom* at 99, 597 A.2d at 679–680 (citations omitted). The majority interprets that language and finds that the determination of whether an act constitutes *gross* negligence is for a jury. However, when the case is entirely free and clear from doubt, it may be removed from the jury and decided as a matter of law. However, this case is not entirely free from doubt and the trial judge's finding of no gross negligence as a matter of law was an abuse of discretion and in conflict with the majority's interpretation of *Bloom*.

In this matter, Appellant has presented sufficient facts to present this case to the jury. Specifically, Appellant asserted that the Hospital ignored warnings of Mrs. Albright's deterio-

1. The definition of flagrant is extremely or deliberately conspicuous; notorious; shocking. The American Heritage Dictionary of the English Language (Second Printing 1969).

rating mental condition after being informed of her manic state by Mr. Albright, and failed to commit her as an inpatient when she declined to follow up her missed December appointment. Further, Mr. Albright informed the hospital that Mrs. Albright was not taking her medication and missed her last appointment. He told the Hospital that she had a breakdown and was becoming manic, walking around at night. He also indicated Mrs. Albright was chain smoking and that there were some cigarette burns on the couch. In response, the Hospital did not believe there was sufficient time to attempt an involuntary commitment as Mrs. Albright was in the 85th day of a 90–day outpatient treatment. Further, the Hospital believed that an emergency commitment was unsupportable.

When viewing those facts in a light most favorable to Appellant as the non-moving party, the question of whether the Hospital's conduct was flagrant or grossly negligent should have been left to the province of the jury, not the judge. The Superior Court below suggests that this case is at worst simply an exercise of poor judgement by the Hospital staff. However, I believe the jury should have been afforded the opportunity to make that ultimate decision.