J. A25009/16

2017 PA Super 11

SUSAN M. MARTIN, AS : IN THE SUPERIOR COURT OF
ADMINISTRATRIX OF THE ESTATE OF : PENNSYLVANIA
DAWN M. MARTIN, AND :
SUSAN M. MARTIN, INDIVIDUALLY :
AND IN HER OWN RIGHT, :
:
Appellant :
:
v. : No. 311 MDA 2016
:
HOLY SPIRIT HOSPITAL :

Appeal from the Order Entered February 1, 2016,
in the Court of Common Pleas of Cumberland County
Civil Division at No. 13-2097

BEFORE: FORD ELLIOTT, P.J.E., SHOGAN, J., AND STEVENS, P.J.E.*

OPINION BY FORD ELLIOTT, P.J.E.: **FILED JANUARY 17, 2017**

Susan M. Martin appeals from the order entered February 1, 2016,

sustaining defendant/appellee's preliminary objections in the nature of a

demurrer and dismissing appellant's third amended complaint with

prejudice. After careful review, we reverse.

In a prior opinion sustaining appellee's preliminary objections to

appellant's first complaint, the trial court summarized the facts of this

matter as follows:

> The pertinent facts, viewed in the light most
> favorable to [appellant] as the non-moving party,
> can be summarized as follows: The decedent,

* Former Justice specially assigned to the Superior Court.

Dawn M. Martin, had a history of mental health problems. On 17 April 2012, the decedent was brought by ambulance to [appellee] Holy Spirit Hospital's Emergency Department (ER) following a suicide attempt. The decedent sought a voluntary 201[1] commitment and, as a result of a "psych diversion" from another hospital, was transported to [appellee]'s ER. She was placed in an exam room upon arrival at 9:24 pm. While in the ER, the decedent had several encounters with hospital personnel; she voiced her suicidal intent several times during these encounters. The decedent was not seen by a physician or the crisis intervention team during her time in the ER before eloping from the hospital.

At some point during her stay in the ER, the decedent changed into a hospital gown and slippers. At approximately 10:45 pm, the decedent left her exam room. She walked past the ER charge nurse's station and the ER discharge and billing desk to get to the ER exit door; the decedent then passed through two ER exit doors and entered the ER lobby. Once in the lobby, the decedent proceeded past the ER triage nurses' station to exit the hospital through open sliding glass doors, still wearing her hospital gown and socks. At no point did any member of [appellee]'s staff intervene or question the decedent as she made her exit. The decedent subsequently walked onto the nearby US Highway State Route 15 where she was struck and killed by passing motor vehicles.

The Commonwealth of Pennsylvania's Department of Health investigated the April 17th incident and reported that the decedent was the ninth mental health crisis patient to elope from the ER without any crisis intervention evaluation in a 3½ month period. [Appellee] was cited by the Commonwealth for having violated regulations involving patient safety and protection and was issued a fine for [its] non-compliance.

---

[1] 50 P.S. § 7201.

Trial court opinion, 10/18/13 at 2-3 (footnotes omitted).

On February 1, 2016, appellee's preliminary objections to appellant's third amended complaint were sustained, and the complaint was dismissed with prejudice. The trial court determined[2] that the Mental Health Procedures Act ("MHPA"), 50 P.S. §§ 7101-7503, applied to this case, and therefore, appellant had to prove willful misconduct or gross negligence. The trial court then determined that at most, appellant's allegations rose to the level of ordinary negligence.[3] As such, appellee was entitled to the benefit of the MHPA's limited immunity provision. This timely appeal followed on February 22, 2016. On March 7, 2016, appellant was ordered to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) within 21 days; appellant complied on March 24, 2016, and the trial court filed a Rule 1925(a) opinion on April 25, 2016.

Appellant has raised the following issues for this court's review:

> A. Whether the trial court committed an error of law when it applied the heightened Standard of the [MHPA] to the admission of decedent, Dawn M. Martin to [appellee], Holy Spirit Hospital on April 17, 2012?
>
> B. Whether the trial court committed an error of law by dismissing, with prejudice, [appellant]'s Third Amended Complaint at the Preliminary Objection phase of litigation by determining

---

[2] The issue was decided by a divided three-judge panel, with one judge dissenting. (Docket #28.)

[3] There was no allegation that appellee engaged in willful misconduct.

> Appellant had not pled sufficient facts to show gross negligence pursuant to the [MHPA]?

Appellant's brief at 5.

The standard of review we apply when considering a trial court's order sustaining preliminary objections is well settled:

> [O]ur standard of review of an order of the trial court overruling or granting preliminary objections is to determine whether the trial court committed an error of law. When considering the appropriateness of a ruling on preliminary objections, the appellate court must apply the same standard as the trial court.
>
> Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint. When considering preliminary objections, all material facts set forth in the challenged pleadings are admitted as true, as well as all inferences reasonably deducible therefrom. Preliminary objections which seek the dismissal of a cause of action should be sustained only in cases in which it is clear and free from doubt that the pleader will be unable to prove facts legally sufficient to establish the right to relief. If any doubt exists as to whether a demurrer should be sustained, it should be resolved in favor of overruling the preliminary objections.

*HRANEC Sheet Metal, Inc. v. Metalico Pittsburgh, Inc.*, 107 A.3d 114, 118 (Pa.Super. 2014).

> In 1976, the General Assembly enacted the MHPA to provide procedures and treatment for the mentally ill in this Commonwealth. The policy of the MHPA is set forth in Section 102, which provides, in pertinent part:
>
>> [I]t is the policy of the Commonwealth of Pennsylvania to seek to assure the availability of adequate treatment to persons who are mentally ill, and it is the

purpose of this act to establish procedures whereby this policy can be effected. The provisions of this act shall be interpreted in conformity with the principles of due process to make voluntary and involuntary treatment available where the need is great and its absence could result in serious harm to the mentally ill person or to others. Treatment on a voluntary basis shall be preferred to involuntary treatment; and in every case, the least restrictions consistent with adequate treatment shall be employed.

***Allen v. Montgomery Hosp.***, 696 A.2d 1175, 1178 (Pa. 1997), quoting

50 P.S. § 7102.

The immunity provision of the MHPA provides in pertinent part as follows:

### § 7114. Immunity from civil and criminal liability

(a) In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be examined or treated under this act, . . . shall not be civilly or criminally liable for such decision or for any of its consequences.

50 P.S. § 7114(a). Under the MHPA, a "facility" is "any mental health establishment, hospital, clinic, institution, center, day care center, base service unit, community mental health center, or part thereof, that provides for the diagnosis, treatment, care or rehabilitation of mentally ill persons, whether

- 5 -

as outpatients or inpatients." 50 P.S. § 7103. "Treatment" is defined as "diagnosis, evaluation, therapy, or rehabilitation needed to alleviate pain and distress and to facilitate the recovery of a person from mental illness and shall also include care and other services that supplement treatment and aid or promote such recovery." 50 P.S. § 7104.

*Downey v. Crozer-Chester Med. Ctr.*, 817 A.2d 517, 524 (Pa.Super. 2003) (*en banc*), *appeal denied*, 842 A.2d 406 (Pa. 2004).

> Our Supreme Court has determined that the immunity provided by the MHPA extends to institutions, as well as natural persons, that provide care to mentally ill patients. *Farago v. Sacred Heart General Hospital*, 522 Pa. 410, 562 A.2d 300, 303 (1989). Additionally, our Supreme Court has interpreted § 7114(a) to include not only treatment decisions, but also, "'care and other services that supplement treatment' in order to promote the recovery of the patient from mental illness." *Allen v. Montgomery Hospital*, 548 Pa. 299, 696 A.2d 1175, 1179 (1997).

*Downey*, 817 A.2d at 525. *See also Farago v. Sacred Heart Gen. Hosp.*, 562 A.2d 300, 303 (Pa. 1989) ("Unquestionably, the clear intent of the General Assembly in enacting Section 114 of the MHPA was to provide limited civil and criminal immunity to those individuals and institutions charged with providing treatment to the mentally ill.").

First, we address appellant's contention that the immunity provisions of the MHPA do not apply because appellee was not providing mental health "treatment" to the decedent at the time of her injury and death. Appellant argues that the decedent had not yet been evaluated by any physicians, crisis intervention personnel, or mental health professionals while in the ER,

and no decisions regarding her care or treatment were made while the decedent was at appellee's facility. (Appellant's brief at 17.) The decedent had not been admitted to the hospital and had not been examined by a physician or psychiatrist in the ER. (*Id.* at 16.) Appellant contends that because the decedent was not receiving "inpatient treatment" while a "resident" at the facility, the MHPA does not apply. (*Id.*, citing 50 P.S. § 7103 ("This act establishes rights and procedures for all involuntary treatment of mentally ill persons, whether inpatient or outpatient, and for all voluntary inpatient treatment of mentally ill persons. "Inpatient treatment" shall include all treatment that requires full or part-time residence in a facility.").)

Appellant relies primarily on this court's decision in *Fogg v. Paoli Mem'l Hosp.*, 686 A.2d 1355 (Pa.Super. 1996), in which this court held that the immunity provisions of the MHPA did not apply because the defendant-hospital had not been "treating" the plaintiff-decedent, Edward H. Fogg, for his mental illness at the time of his injury. We find *Fogg* to be factually distinguishable. In that case, Mr. Fogg's treating psychiatrist arranged for him to be admitted to the psychiatric wing of Paoli Memorial Hospital. *Id.* at 1356. Mr. Fogg had a history of psychiatric problems including anxiety, depression, and audio/visual hallucinations. *Id.* When Mr. Fogg and his parents arrived at the ER, they were instructed to have a seat in the waiting room. *Id.* Mr. Fogg's parents told the registrar that their son was having

hallucinations and had a bed reserved for his admission in the psychiatric ward. *Id.* Mr. Fogg did not receive any medical treatment and was not seen by any medical personnel. *Id.* at 1356-1357.

Eventually, after repeated inquiries by Mr. Fogg's parents, the registrar directed them to the hospital admissions desk. *Id.* at 1357. The Foggs proceeded down the hallway unescorted. *Id.* At the end of the hallway was a large window, facing west into the setting sun. *Id.* Mr. Fogg became agitated and ran down the hallway towards the setting sun, crashing through the window and falling two stories onto a concrete driveway. *Id.* Mr. Fogg died the following day. *Id.*

In finding that the hospital was not entitled to limited immunity under the MHPA, this court emphasized that Mr. Fogg had not been seen by any health-care professionals while in the ER:

> In this case the trial court correctly noted that Mr. Fogg was not yet being treated by Appellant at the time of his injuries. Although he presented himself for treatment at the emergency room, he was not examined or treated by any hospital personal [sic] while in the emergency room, and no decisions regarding his care or treatment were made while Mr. Fogg was at Appellant's facility. Since no one from Appellant-hospital who was trained in the field of mental health was treating Appellant or making decisions regarding his treatment at the time of the accident, Appellant cannot avail itself of the immunity protections of the MHPA.

*Id.* at 1358; *see also McNamara v. Schleifer Ambulance Serv.*, 556 A.2d 448 (Pa.Super. 1989) (ambulance service not entitled to immunity

under Section 7114 of the MHPA where a patient was injured when he jumped out of the rear doors of a moving ambulance which was transferring him to a state hospital to receive court-ordered involuntary treatment).

Here, it is undisputed that the decedent was never evaluated by a physician or a psychiatrist. She was never formally admitted to the hospital, nor were any treatment decisions made on her behalf. **Compare Farago**, 562 A.2d at 304 (decision by hospital staff to allow a female patient, who alleged she was raped by a male patient in the bathroom, to remain in the open ward on one-hour watch rather than on closer supervision, was a "treatment decision" protected by the immunity provisions of the MHPA in the absence of willful misconduct or gross negligence). However, unlike the plaintiff-decedent in **Fogg**, the decedent in this case was seen by trained nursing staff and some degree of professional medical care was administered. In her third amended complaint, appellant alleged, in relevant part:

> 20. Between 9:29 p.m. and 9:43 p.m. [] Defendant's [ER] nurse, Danielle Velgos, recorded Decedent's history of a suicide attempt an hour earlier including details of the police having stopped her from jumping out of a second story window at home.
>
> 21. Defendant's medical records document Decedent's complaint as "CRISIS; SUICIDAL."
>
> 22. Defendant's ER staff also recorded Decedent's psychiatric history of depression, anxiety, suicidal attempts, as well as her active suicidal thoughts given her responding "Yes" to the

question: "Do you currently have any thoughts of hurting yourself or others?"

23. At 9:45 p.m. [] Defendant's records note "protocol initiated."

24. At 10:18 p.m. [] Decedent's street clothes were removed and replaced with a blue paper hospital gown and slippers.

25. At 10:20 p.m. [] Defendant's medical records note, "pt still actively suicidal stating she wishes they would have let her jump."

27. At 10:20 p.m. [] Defendant's medical records note, "pt made previous statement to EDT."

28. At 10:35 p.m. [] Defendant's medical records note, "pt given OJ, resting in bed w/o complaints."

29. At 10:45 p.m. [] Defendant's medical records note, "pt resting on bed" and the entry continued to another page and further notes, "con't: pt cooperative and appropriate with staff, suicidal ideations not verbalized to RN curtain open. Still awaiting physician evaluation."

Plaintiff's Third Amended Complaint, 8/19/15 at ¶¶ 20-25, 27-29 (punctuation corrected).

Therefore, in contrast to Mr. Fogg, who did not interact with anyone at the hospital other than the registrar, the decedent in this case was seen by ER nursing staff who documented her psychiatric history and her recent suicide attempt. The decedent was given a bed, a hospital gown and slippers, and orange juice. While appellant obviously disagrees with the level of treatment provided, we cannot say that the decedent was not being

"treated" for purposes of the MHPA, which includes diagnosis and evaluation by any authorized person. **See Allen**, 696 A.2d at 1179 (consistent with the purposes of the MHPA, "treatment is given a broader meaning in the MHPA to include medical care coincident to mental health care"). For these reasons, we agree with the trial court that appellee was entitled to invoke the immunity provision of Section 7114 of the MHPA, unless its actions in treating the decedent constituted willful misconduct or gross negligence.

We now turn to appellant's second issue, in which she argues that the third amended complaint adequately pled "gross negligence," as that term has come to be defined under the MHPA, to permit further discovery. We agree.

> Our supreme court adopted this court's definition of gross negligence in **Albright v. Abington Memorial Hosp.**, 548 Pa. 268, 696 A.2d 1159 (1997):
>
>> 'It appears that the legislature intended to require that liability be premised on facts indicating more egregiously deviant conduct than ordinary carelessness, inadvertence, laxity, or indifference. We hold that the legislature intended the term gross negligence to mean a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference. The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care.'
>
> **Id.** at 278, 696 A.2d at 1164, quoting **Bloom v. DuBois Regional Medical Center**, 409 Pa.Super. 83, 597 A.2d 671, 679 (1991).

*Walsh v. Borczon*, 881 A.2d 1, 7 (Pa.Super. 2005).

> While it is generally true that the issue of whether a given set of facts satisfies the definition of gross negligence is a question of fact to be determined by a jury, a court may take the issue from a jury, and decide the issue as a matter of law, if the conduct in question falls short of gross negligence, the case is entirely free from doubt, and no reasonable jury could find gross negligence.

*Albright*, 696 A.2d at 1164-1165.

With regard to gross negligence, appellant leveled the following allegations, in pertinent part:

30. Due to understaffing, Defendant's ER nurse, who should have been checking on Decedent, abandoned Decedent and left her completely unattended in order to transfer another patient to a floor elsewhere in the hospital.

31. No replacement nurse or security guard of any type was assigned by Defendant to watch or care for Decedent in the interim and it was at this time Decedent took advantage of the fact she was not being supervised and eloped.

32. Video from Defendant Holy Spirit Hospital reveals that at approximately 10:50 p.m. [] Decedent walked out of the [ER], passed [sic] three nurses['] stations in a hospital gown and slippers.

33. Decedent's exam room #4 was directly across from, and in full view of, the ER charge nurse's station---a centralized nursing unit and communications hub for nurses, physicians, residents, unit secretaries, hospital aides and other staff.

34. Not a single nurse, physician, resident, unit secretary, aide or hospital staff member challenged, stopped, intervened, or questioned Decedent as she walked past the charge nurses' station while gripping her head with both hands and proceeded to exit through a first set of unlocked emergency room doors.

35. After Decedent passed the charge nurses' station unchallenged, Decedent was next in direct and open view of the ER discharge and billing desk.

36. While still gripping her head with both of her hands and wearing only a blue paper gown and socks on her feet, Decedent opened the unlocked ER exit door which lacked any badge swipe or security alarm system that would prevent the inappropriate departure of mental crisis patients from the hospital's premises, and walked out unnoticed to a small vestibule.

37. While still in full view of the ER discharge and billing desk, Decedent opened a second unlocked ER exit door, which lacked any badge swipe or security alarm system that would prevent the inappropriate departure of mental crisis patients from the hospital's premises, and walked out unnoticed into the ER lobby still gripping her head with both of her hands and wearing only a blue paper gown and socks on her feet.

38. Not a single nurse, physician, receptionist, secretary, resident, billing clerk[,] security guard or hospital staff member challenged, stopped, intervened, or questioned Decedent as she walked out of the unlocked emergency room doors while still gripping her head with both of her hands and wearing only the blue paper gown and socks on her feet.

39. While in full view of the ER lobby, ER reception area and ER triage nurses' station, Decedent

walked out of the emergency department unnoticed through open sliding glass doors while still gripping her head with both of her hands and wearing only the blue paper gown and socks on her feet.

40. Not a single nurse, physician, receptionist, secretary, security guard or hospital staff member challenged, stopped, intervened, or questioned [decedent] as she walked out of the ER while still gripping her head with both of her hands and wearing only the blue paper gown and socks on her feet.

41. Defendant's inside surveillance video cameras reveal shocking footage of Decedent wearing a hospital wrist ID band, a blue paper gown and socks on her feet, gripping her pounding head with both her hands (right hand gripping her forehead and left hand gripping the back of her head), walking past the three (3) separate nurses' stations, opening two (2) sets of unlocked doors, reaching the glass sliding front doors of the emergency department and walking out of the ER into the night.

42. Directly outside of Defendant Holy Spirit Hospital's ER entrance[] were at least three (3) exterior mounted surveillance cameras and two (2) additional outside surveillance cameras mounted on an adjacent hospital building at 210 Senate House.

43. At approximately 11:00 p.m., Harrisburg Police were dispatched to a grisly scene on US 15 where Decedent was pronounced dead as a result of a motor vehicle collision.

44. The Harrisburg Area Police Report concluded the death was an apparent suicide and the Cumberland County Coroner[']s Office ruled the death a suicide.

45. At 11:05 p.m. [] Defendant's medical records note, "pt not in room when checked by RN, security notified, staff and security searching premises."

46. At 11:13 p.m. [] Defendant's medical records note, "pt not on premises, east pennsboro police notified of patient elopement."

47. Defendant's staff did not notice that Decedent was gone until 11:05 p.m. and then waited until 11:13 p.m. to notify police that their patient was missing.

48. Based on the knowledge of her suicide attempt and repeated, voiced intention to end her life, Defendant had a duty to keep her safe.

49. Defendant made no attempt to move any non-suicidal patients out of Defendant's psych unit to make room for Decedent.

50. None of the nurses who recorded that Decedent remained actively suicidal had any psychiatric ward experience or mental health crisis training.

51. Decedent was placed in a regular open ER room because the blocked off psychiatric unit rooms (with locked doors, protected windows and security) were fully occupied.

52. No 1:1 observation was ordered or provided.

59. Decedent was left unsupervised, was never seen by any mental health care professional, did not receive a psychiatric evaluation, was not placed in a secure location, was not seen by any ER physician, crisis intervention was never called, she was not treated or medicated and was left completely alone, unsupervised----all contrary to the hospital's own policies, and in violation of the Professional Hospital Security Management

Regulations, Pennsylvania State Department Health Codes, and multiple Federal Patient Safety Regulations.

60. Decedent was kept waiting in exam room #4 for 1½ hours without being seen by any physician, medical student, resident or crisis intervention staff.

67. An investigation by the Commonwealth of Pennsylvania's Department of Health exposed that in the short 3 1/2 month interval between January 1, 2012 and April 17, 2012, Decedent was the hospital's ninth (9th) mental health crisis patient who came to Defendant's [ER] looking for help but was left in an unsecured area, unsupervised and was allowed to elope from the emergency room without any crisis intervention evaluation.

68. Averment 67 is pled to prove Defendant had notice that mental health patients eloped from their facility on at least 8 occasions prior to Decedent.

69. Despite Defendant's awareness of repeat problems existing in their emergency department concerning mentally ill patients eloping out of the ER without crisis intervention evaluations (at least 8 prior to Decedent's and possibly more), no corrective action was taken to protect the safety and well-being of future mental health patients, specifically Decedent.

72. Defendant's ER staff consciously, with full knowledge of potential consequences, outrageously disregarded the hospital's own Quality Assurance protocols, Emergency Department protocols, Crisis Management protocols and Clinical Nurse Protocols that were in effect at the time.

73. Defendant Holy Spirit Hospital's Clinical Nurse Practice protocols entitled "Suicide

> Precautions" which required that mental crisis patients, such as Decedent, receive monitoring with close 1:1 observation was breached.

Plaintiff's Third Amended Complaint, 8/19/15 at ¶¶ 30-52, 59-60, 67-69, & 72-73.

Appellant alleged that appellee grossly deviated from the accepted standard of mental-health care in failing to place the decedent in a secure location, failing to provide nursing supervision to a suicidal patient, failing to implement a "fail safe system" of preventing the elopement of mental-crisis patients from the ER with door locks, alarms, badge-swipe systems, *etc.*, failing to follow its own protocols for suicidal patients, failing to call crisis intervention to evaluate the decedent, and failing to act upon security surveillance footage showing the decedent eloping from the ER. (*Id.* at pp. 12-13, ¶ 84.) In addition, appellant alleged that appellee knew it had a problem with mental crisis patients eloping from its facility and failed to take any action to protect future patients such as the decedent. (*Id.* at pp. 13-14, ¶¶ 85-87.)

We find this court's decision in *Bloom* to be instructive. We briefly summarized the facts of that case as follows:

> On October 24, 1986, plaintiff appellant Cindy Bloom was voluntarily admitted to the psychiatric unit of DuBois Regional Medical Center (the "Hospital"). The next evening, Mrs. Bloom's husband (co-appellant) came to visit his wife. He found her hanging by the neck from shoestrings behind a bathroom door adjacent to her hospital room in an

evident suicide attempt. Fortunately, Mrs. Bloom's attempt failed.

*Bloom*, 597 A.2d at 673. Mr. and Mrs. Bloom brought a complaint alleging, *inter alia*, failure to adequately test, diagnose, and supervise Mrs. Bloom. *Id.* at 673-674. This court found that the complaint "sufficiently pleaded acts that could, upon further development of the facts and production of evidence, be found by a jury to constitute gross negligence." *Id.* at 677 (footnote omitted).

> The complaint alleged that the defendants, who held themselves out as competent to provide psychiatric treatment to one in the position of Mrs. Bloom, completely failed to diagnose her mental condition and treat her in a manner that would protect her from serious physical harm. It further averred that upon admission the defendants were informed of Mrs. Bloom's mental disorder and nevertheless failed to take adequate precautions to assure her safety. These allegations encompass the potential of showing conduct on the part of the defendants that might be considered grossly negligent. Based on the complaint, it is not certain whether the plaintiffs can develop evidence that will demonstrate that the defendants' failure was flagrant enough to be characterized as a gross deviation from the applicable standard of care.

*Id.* at 679.

Importantly, as in the case *sub judice*, this court in *Bloom* was reviewing the trial court's grant of the defendants' preliminary objections, before the plaintiffs had the opportunity to fully develop their case:

> We further note that the determination of whether an act or failure to act constitutes negligence, of any degree, in view of all the evidence has always been

> particularly committed to determination by a jury. It is an issue that may be removed from consideration by a jury and decided as a matter of law only where the case is entirely free from doubt and there is no possibility that a reasonable jury could find negligence. In this case, the trial court not only prevented the issue of the proper characterization of the defendant's conduct from going to a jury, but foreclosed plaintiffs-appellants from moving past the pleading stage of their case. This was error. Thus, the dismissal of Dr. Fugate on immunity grounds at this stage of the case must be reversed.

*Id.* at 679-680 (citations and footnote omitted). Similarly, here, appellant claims that appellee failed to take adequate precautions to assure the decedent's safety. Appellant alleges that according to appellee's own protocols, the decedent should have received close monitoring with 1:1 observation. (Plaintiff's Third Amended Complaint, 8/19/15 at ¶ 73.) The decedent waited 1½ hours in the ER without being evaluated by a physician, psychiatrist, or crisis intervention staff. (*Id.* at ¶ 60.) According to appellant, the decedent was the ninth mental-crisis patient in the past 3½ months to elope from the ER. (*Id.* at ¶ 67.) Yet, appellee failed to take any measures to protect future mental-crisis patients such as installing door locks and alarms. (*Id.* at ¶ 71.) We determine that based on the facts pled in appellant's third amended complaint, a jury could find that appellee's actions constituted gross negligence, as they could be interpreted as "flagrant, grossly deviating from the ordinary standard of care." *Albright*, 696 A.2d at 1164; *see also Potts v. Step By Step, Inc.*, 26 A.3d 1115 (Pa.Super. 2011) (where the complaint alleged that facility's staff members

ignored nurse's specific instructions to contact her immediately if the decedent vomited or had problems holding down fluids, and no staff member performed CPR and there was a delay in contacting 9-1-1, the trial court erred in granting judgment on the pleadings and the complaint sufficiently pled facts that a jury could find constituted gross negligence or incompetence).

Appellee attempts to distinguish *Bloom* on the basis that the decedent in the instant case was a voluntary commitment. (Appellee's brief at 31-32.) However, in *Bloom*, the patient was also a voluntary commitment. *Bloom*, 597 A.2d at 673. In addition, appellee's characterization of the decedent as a "voluntary" presentation, while perhaps technically accurate, is a distortion of the alleged facts. As recounted above, according to the complaint, the decedent attempted suicide and had to be pulled from the second-story window by police. (Plaintiff's Third Amended Complaint, 8/19/15 at ¶¶ 7-8.) EMS was dispatched and police informed the decedent that they intended to involuntarily commit her pursuant to Section 302. 50 P.S. § 7302. (*Id.* at ¶ 11.) However, the decedent indicated she wanted to go as a voluntary Section 201 commitment and would cooperate with EMS. (*Id.*) In context, this can hardly be fairly characterized as a "voluntary" presentation. The decedent was suicidal and was told she could either go voluntarily or be involuntarily committed.

Similarly, appellee's contention, that as a "voluntary commitment," the decedent "was free to leave on her own accord," is contradicted by the facts as alleged by appellant. Decedent presented at the hospital as a mental-crisis patient with a history of a recent suicide attempt. The medical records documented her as "CRISIS; SUICIDAL." (***Id.*** at ¶ 21.) The decedent's records noted, "protocol initiated," and her street clothes were removed. (***Id.*** at ¶¶ 23-24.) According to appellant's complaint, appellee's own protocols mandate close observation of mental-crisis patients. (***Id.*** at ¶ 73.) Clearly, the decedent was not "free to leave," as though she arrived at the ER complaining of a scraped elbow. This was a woman in serious mental distress. Furthermore, if she were free to leave at any time, as suggested by appellee, there would be no reason for hospital staff to alert the police that a mental-crisis patient had "eloped."

Both the trial court and appellee cite the MHPA's mandate to impose the least restrictive alternatives consistent with affording the patient adequate treatment for his/her condition. 50 P.S. §§ 7102, 7107. Presumably, however, the "least restrictive alternative" does not include allowing a mental-crisis patient with a recent history of a suicide attempt to walk out of the ER in her socks and hospital gown while clutching her head in obvious distress. In fact, this is the gravamen of appellant's complaint.

For these reasons, we conclude that 1) appellee was a facility providing "treatment" to the decedent, a mentally ill patient, and, therefore,

is entitled to limited immunity under the MHPA; and 2) appellant's factual allegations in the third amended complaint could, upon further development, be found by a jury to constitute gross negligence. Therefore, the trial court erred in granting appellee's preliminary objections. It is important to note that this court is not holding that appellant's allegations conclusively establish gross negligence as a matter of law; rather, the facts pled in appellant's third amended complaint are sufficient to move past the preliminary objections stage of the proceedings.

Order reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/17/2017